[No. 27029-3-II. Division Two. September 13, 2002.]

HENRY J. BORDEN, ET AL., *Appellants*, v. THE CITY OF OLYMPIA, *Respondent*.

360

*Robert H. Raymond, Jr.*, for appellants.

*W. Dale Kamerrer* (of *Law, Lyman, Daniel, Kamerrer & Bogdanovich*), for respondent.

MORGAN, J. — Henry and Loretta Borden sued the City of Olympia because their property flooded. They alleged inverse condemnation, trespass, nuisance, negligence, and waste under RCW 4.24.630. The trial court granted summary judgment to the City. Taking the facts and inferences in the light most favorable to the Bordens,[1] we reverse in part and affirm in part.

In 1980, the Bordens bought four acres, the east half of which was improved with a house and detached shop. They have lived in the house ever since.

In 1991, the Bordens short platted their four acres by drawing a north-south line from approximately the midpoint of their northern boundary to approximately the midpoint of their southern boundary. The result was a two-acre parcel, Lot 1, lying west of another two-acre parcel, Lot 2. In 1995, they sold Lot 1, which is currently owned by people named Comstock.

---

[1] *King County v. Taxpayers of King County*, 133 Wn.2d 584, 616, 949 P.2d 1260 (1997) (citing *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 256-57, 616 P.2d 644 (1980)).

The Bordens' original four acres lies in a natural drainage basin. The basin's low point is near the center of its northern portion. Surrounding this low point is a wetland, known locally as the Royal Gardens Wetland. The wetland is irregularly shaped and "closed" in the sense that it drains only by seepage into the ground. The distance from the wetland's eastern boundary to the Bordens' house is about 595 feet.

The land east of the wetland rises from west to east. The wetland's eastern boundary is about 171 feet above Mean Sea Level (MSL), and Lot 1's western boundary is about 173 feet above MSL. The floor of the Bordens' basement is about 175 feet above MSL, and the first floor of the Bordens' house is about 182 feet above MSL. Stormwater flows from east to west when present on the Bordens' property.

In 1995, private developers built a new stormwater drainage project on privately owned land. The project collected water from three new subdivisions to the south, brought it north, and discharged it into the Royal Gardens Wetland. The result, according to evidence that favors the Bordens, was to significantly increase the volume of water being drained into the Royal Gardens Wetlands.[2]

The City approved permits for the new project. It also helped design and pay for the new project. As the Supervisor of the City's Water Resource Program stated in a 1993 memorandum:

> The Water Resources Program, as part of the City's Stormwater Utility, is responsible for solving existing flooding problems as well as preventing future problem areas resulting from development. In this role, Program staff have actively participated for nearly two years in the ongoing planning and problem-solving process in the Rossmoor-Briarwood subbasin in southeast Olympia. Program staff have provided considerable hydrologic modeling and technical review, especially during the

---

[2] Clerk's Papers (CP) 203-06.

last six months. Nearly all of this work was in excess of our typical "consultant" role.[3]

The City initially proposed to pay about one-third ($47,433) of the project's estimated cost ($145,000),[4] but later said it would pay one-half of the project's actual cost, not exceeding $72,500.[5]

The project was completed in November 1995, and the Bordens experienced flooding in February 1996. The flooding recurred during the winters of 1996-97, 1997-98, and 1998-99. The basement of their house flooded four times, and their shop flooded three times. Their yard "developed standing ponds some feet in depth," and some "decorative cedar trees approximately 10-12 years old" died due to "soil saturation."[6]

Meanwhile, the Comstocks' lower-lying land was also flooding. The City responded by

> installing a very large pump and pipeline system on the Comstock property. This pump ran every day, and pumped hundreds of thousands of gallons of water each day from the Royal Gardens Wetlands north along Allen Road, thence into the stormwater system for the Marie's Vineyard development. This lowered the water sufficiently to abate the surface water flooding on much, but not all, of the Comstock property but those waters remained at substantially higher elevations than historical water levels.[7]

---

[3] CP at 272. The City confirms this memo in its brief on appeal. It states that it "expand[ed] the hydrological modeling first performed by the developers' engineer and cooperated with that engineer in subsequent modeling activities." Br. of Resp't at 16. It also states that its "participation resulted in changes . . . which decreased the developers engineers' assumptions about the absorption and subsurface drainage rates of the Royal Gardens Wetland, and increased the size of the detention and conveyance systems that would be built by the developers." Br. of Resp't at 17.

[4] CP at 273; CP at 290.

[5] CP at 273; CP at 290. In its brief on appeal, the City explains that it "agreed to financial participation in the pipe project . . . because the drainage basin . . . was not yet fully developed, and some flooding problems already existed." Br. of Resp't at 15-16.

[6] CP at 153.

[7] CP at 153-154.

In the winter of 1999-2000, the City completed "a munici-pal drainage facility that drew waters out from the Royal Gardens Wetlands and conveyed them north . . . into the headwaters of Woodland Creek."[8] The Bordens' flooding then abated.

In 1999, the Bordens sued the City. They alleged negli-gence, nuisance, inverse condemnation, trespass, and statutory waste. The City denied liability, based in part on the common enemy doctrine.

In 2000, the City filed a motion for summary judgment, and the Bordens responded with a cross-motion of their own. The Bordens supported their motion with a declara-tion from Henry Borden, who is himself a practicing engi-neer, in which he described the effects of the discharge of additional water into the wetlands. He stated:

> The result of these new discharges into the wetlands was to supercharge the wetlands, and to exceed the capacity of the soils to accept them and convey them away, with the immediate result of raising the water table on and under my property and surrounding properties. This higher water table has two re-sults. First, where it is sufficiently high it causes damage to my basement and to my trees and land by saturating the soil. Second, it acts as an impervious surface preventing water that would percolate into the soil in normal conditions to pond above the groundwater table, further raising the water table eleva-tion. Some of these higher waters leached onto the surface of the ground, some saturated my soils and prevented the normal infiltration and percolation my land previously accomplished, some entered my basement.[9]

On January 22, 2001, the trial court ruled that the record lacked sufficient evidence to support the Bordens' claims. Accordingly, it granted the City's motion and denied the Bordens' motion. The Bordens then filed this appeal.

Although the Bordens claim that the 1995 drainage system brought additional water from remote locations and

[8] CP at 153.

[9] CP at 155-156.

discharged it into the Royal Gardens Wetlands, they do not claim that the additional water physically invaded their property as surface water. Rather, they claim that the additional water saturated ("supercharged") the ground and raised the water table, thereby causing the ground not to accept stormwater that otherwise would have drained to the west. In short, they claim that the City was a user of land downhill from theirs, that the City obstructed the flow of surface and groundwater, and that the City should be held liable for doing that.[10]

Given the nature of this claim, the main question here concerns Washington's version of the common enemy rule. We discuss that rule in Section I, and the Bordens' specific causes of action in Section II.

## I

■ In *Cass v. Dicks*, an 1896 case, the Washington Supreme Court adopted what is generally referred to as the common enemy rule. The court said:

> If one in the lawful exercise of his right to control, manage or improve his own land, finds it necessary to protect it from surface water flowing from higher land, he may do so, and if damage thereby results to another, it is *damnum absque injuria*.[11]

In *Wilkening v. State*, a 1959 case, the Washington Supreme Court extended this rule from surface water to groundwater. The plaintiff owned land with a high natural embankment. The State lawfully constructed improvements at the bottom of the embankment. The improve-

---

[10] For example, the Bordens state in their Reply Brief at 14 that additional water from the 1995 drainage project "formed a dam in both the wetland and the underlying soil on the Bordens' land that blocked the groundwater flows on the Bordens' land, directly and proximately causing the flood damages on the Bordens' land."

[11] *Cass v. Dicks*, 14 Wash. 75, 78, 44 P. 113 (1896). According to *Black's Law Dictionary* 470 (4th ed. 1968), *damnum absque injuria* means "[l]oss, hurt, or harm without injury in the legal sense, that is, without such breach of duty as is redressible by an action. A loss which does not give rise to an action for damages against the person causing it."

ments interfered with the embankment's drainage, thereby raising the water table and weakening the toe of the slope. Affirming judgment for the State, the Supreme Court stated:

> Since a landowner, in the lawful exercise of his right to improve his own land, may protect it from surface waters without liability, no reason occurs to us why he should be liable for the result of lawful acts, upon his own land, which impede the flow of underground percolating waters. If damages result to another, it is *damnum absque injuria*.[12]

■ Both before and after *Wilkening*, the Washington Supreme Court recognized at least two exceptions to the common enemy doctrine. One, not pertinent here, provides that even though a downhill landowner can lawfully repel surface water from his or her land, he or she cannot lawfully do so by blocking a natural watercourse or natural drainway.[13] Another, which we hereafter call the "channel-and-discharge" exception, provides that an uphill landowner cannot lawfully collect water in an artificial channel, then discharge it "upon adjoining lands in quantities greater than or in a manner different from the natural flow thereof."[14]

■ In *Currens v. Sleek*, a 1999 case, the Washington Supreme Court recognized a third "exception," which it referred to as a "due care exception."[15] This "exception," the court said, provides that a landowner is not liable for altering the flow of surface water—so long as he or she acts "in good faith and with such care as to avoid unnecessary damage to the property of adjacent owners."[16] This "exception," the court said, does not require "inquiry into the

---

[12] *Wilkening v. State*, 54 Wn.2d 692, 698, 344 P.2d 204 (1959) (emphasis omitted) (citations omitted).

[13] *Currens v. Sleek*, 138 Wn.2d 858, 862, 983 P.2d 626 (1999); *Island County v. Mackie*, 36 Wn. App. 385, 388, 675 P.2d 607 (1984).

[14] *Currens*, 138 Wn.2d at 862 (citing *Wilber Dev. Corp. v. Les Rowland Constr. Inc.*, 83 Wn.2d 871, 875, 523 P.2d 186 (1974)).

[15] *Currens*, 138 Wn.2d at 864.

[16] *Currens*, 138 Wn.2d at 863.

utility of the particular project," although it does require inquiry into "whether the landowner has exercised due care in improving his or her land, i.e., whether the method employed by the landowner minimized any unnecessary impacts upon adjacent land."[17] "[I]n practical terms," the court said, this means "that landowners may improve their land with impunity (subject to local land use and permitting requirements) and are not liable for damage caused by the change in the flow of surface water onto their neighbors' land, so long as the landowners act in good faith and do not damage adjacent property in excess of that called for by the particular project."[18] In reality if not in terminology, this also means that Washington now recognizes a negligence cause of action for altering the flow of naturally occurring surface and groundwater.

■ The Bordens rely in part on the "channel-and-discharge" exception. As already seen, however, that exception applies when water that has been artificially channeled is discharged onto the surface of the plaintiff's land in a manner different from its natural flow.[19] It does not apply when such water never reaches the surface of the plaintiff's land. The water that was discharged here went into the wetlands and then into the ground, raising the water table. It did not invade the surface of the Bordens' land, so the "channel-and-discharge exception" does not apply.

■ The Bordens also rely on *Currens'* "due care" exception. As already seen, this "exception" amounts to a limited

---

[17] *Currens*, 138 Wn.2d at 866.

[18] *Currens*, 138 Wn.2d at 864.

[19] *E.g.*, *Phillips v. King County*, 136 Wn.2d 946, 968, 968 P.2d 871 (1998) ("municipality may not collect surface water by an artificial channel . . . and pour it . . . on the land of a private person, to *his or her* injury"); *DiBlasi v. City of Seattle*, 136 Wn.2d 865, 879, 969 P.2d 10 (1998) ("Having concluded that a municipality may be liable for damages to an adjoining landowner's property caused by a street which acts to collect, channel and thrust water in a manner different from the natural flow, the next question is whether [the street] acted in such a way as to cause damage to the DiBlasi [the plaintiff's] property."); *see Wilber Dev. Corp.*, 83 Wn.2d at 876 ("The allegation that the *manner* in which the water is deposited upon *the plaintiff's* land affects the ability *to* drain that land, may be difficult to prove . . . but it is a material question at issue in the case.") (second emphasis added).

cause of action for negligently altering the flow of surface or groundwater. Accordingly, we ask (A) whether the City owed a duty of due care, (B) whether the evidence is sufficient to support a finding that the City breached such a duty, and (C) whether the evidence is sufficient to support a finding that the breach, if any, proximately caused the Bordens' alleged damages.

The Bordens claim in effect that the City owed them a duty of due care because the record supports inferences that the City participated in the 1995 drainage project and that the 1995 drainage project altered the flow of surface and groundwater on their land. The City responds that (1) it did not owe a duty because it did not participate in the 1995 drainage project, (2) it is a municipality rather than a private landowner, and (3) it is protected by the public duty doctrine. For the reasons that follow, we agree with the Bordens.

█ █ The City says it does not owe a duty of due care under *Currens* because it did not actively participate in the 1995 drainage project; it only approved and permitted plans submitted by the developer. As a general rule, one who undertakes to act in a given situation has a duty to follow through with reasonable care, even though he or she had no duty to act in the first instance.[20] A City does not undertake to act if it goes no farther than reviewing and permitting a project submitted by a private developer,[21] but in our view it does if it actively participates in designing and funding

---

[20] *Folsom v. Burger King*, 135 Wn.2d 658, 676, 958 P.2d 301 (1998); *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 299, 545 P.2d 13 (1975); *Meneely v. S.R. Smith, Inc.*, 101 Wn. App. 845, 857, 5 P.3d 49 (2000), *review denied*, 142 Wn.2d 1029 (2001); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 56, at 380 (5th ed. 1984). *See also Phillips*, 136 Wn.2d at 968 (inverse condemnation case; "If it is proven at trial that the County participated in creation of the problem, it may participate in the solution.").

[21] *See Phillips*, 136 Wn.2d at 961-62 (City does not "take" property for purposes of inverse condemnation merely because it reviews and permits a project submitted by a developer) (clarifying and partially overruling *Wilber Dev. Corp.*, 83 Wn.2d 871).

the project.[22] A trier of fact could find from the record here that the City "actively participated for nearly two years in the ongoing planning and problem-solving process"; that the City "provided considerable hydrologic modeling and technical review"; and that "[n]early all of this work was in excess of [the City's] typical 'consultant' role."[23] A trier of fact could also find that the City paid a substantial portion of the project's cost. These facts are sufficient to support a finding that the City actively participated in the 1995 project, and, if such a finding is made, that the City owed a duty of due care.[24]

■ The City says it does not owe a duty of due care because it is a municipality rather than a private landowner. We rejected this argument in the recent case of *Ripley v. Grays Harbor County*, wherein we said:

> The County provides no public policy analysis to support its contention that the *Currens* due care exception to the common enemy doctrine should also not apply in this context [i.e., to municipal road building]. Nor do we see a basis for shielding governments from the responsibility of acting in good faith and avoiding unnecessary damage to others. Further, the *Currens* court specifically relied on several cases involving governmental road building activities.[25]

This reasoning is consistent with the remainder of the cases, which generally equate municipalities and private

---

[22] *See Phillips*, 136 Wn.2d at 967-68, an inverse condemnation case in which the Supreme Court stated:

> As in the *Wilber* case, the County's action here was not simply approval and permitting—it was actual involvement in the drainage project. If it is proven at trial that the County participated in creation of the problem, it may participate in the solution.

*See also Wilber Dev. Corp.*, 83 Wn.2d at 874.

[23] CP at 272.

[24] *Phillips*, 136 Wn.2d at 968 (holding for purposes of inverse condemnation claim that if county "participated in creation of the problem," it may be held liable at trial); *Wilber*, 83 Wn.2d at 874.

[25] *Ripley v. Grays Harbor County*, 107 Wn. App. 575, 581, 27 P.3d 1197 (2001).

landowners for purposes of the common enemy doctrine.[26] Here as in *Ripley*, we decline to distinguish between a municipality and a private landowner for purposes of the common enemy doctrine.

 The City says it does not owe a duty of due care because of the public duty doctrine. The public duty doctrine does not apply, however, when a government performs a proprietary function.[27] Instead, a government performing a proprietary function owes the same duty of care as a private individual engaged in the same activity.[28] A government performs a proprietary function " 'when it engages in a business-like venture as contrasted with a governmental function.' "[29] Examples of proprietary function include operating a water system[30] or a sewer system.[31]

In this case, the City helped private developers design, engineer, and pay for a new stormwater drainage system. It essentially was aiding and cooperating with private developers for these purposes. It was engaging in a proprietary function, and the public duty doctrine does not apply.

 Turning from duty to breach, we ask whether a trier of fact could rationally find that the City breached its duty of due care. Taken in the light most favorable to the Bordens, the record supports inferences that the City knew or should have known that the water table would rise; that

---

[26] *See, e.g., Phillips*, 136 Wn.2d at 958; *Wilber Dev. Corp.*, 83 Wn.2d at 874-75; *Strickland v. City of Seattle*, 62 Wn.2d 912, 915, 385 P.2d 33 (1963); *Laurelon Terrace, Inc. v. City of Seattle*, 40 Wn.2d 883, 893, 246 P.2d 1113 (1952); *Rothweiler v. Clark County*, 108 Wn. App. 91, 98, 29 P.3d 758 (2001); *Patterson v. City of Bellevue*, 37 Wn. App. 535, 537, 681 P.2d 266 (1984).

[27] *Dorsch v. City of Tacoma*, 92 Wn. App. 131, 135, 960 P.2d 489 (1998) (citing *Bailey v. Town of Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257 (1987); *Moore v. Wayman*, 85 Wn. App. 710, 715, 934 P.2d 707, *review denied*, 133 Wn.2d 1019 (1997)).

[28] *Bailey*, 108 Wn.2d at 268; *Russell v. City of Grandview*, 39 Wn.2d 551, 553, 236 P.2d 1061 (1951); *Dorsch*, 92 Wn. App. at 135.

[29] *Hoffer v. State*, 110 Wn.2d 415, 422, 755 P.2d 781 (1988) (quoting Black's Law Dictionary 1097 (5th ed. 1979)); *Moore*, 85 Wn. App. at 715-16; *see Russell*, 39 Wn.2d at 553.

[30] *Russell*, 39 Wn.2d at 553.

[31] *Hayes v. City of Vancouver*, 61 Wash. 536, 538, 112 P. 498 (1911).

surrounding properties would be adversely affected; and that alternatives were reasonably available.[32] Henry Borden, himself a professional engineer, opined in effect that if the City had properly analyzed the basin's drainage capabilities before designing the 1995 project, it would have realized that the project would adversely affect surrounding properties and that alternatives should be employed. A trier of fact could rationally find that the City did not use due care to minimize the Bordens' damages, and a trier of fact must decide whether the City fulfilled or breached the duty described in *Currens*.

▮ Turning from breach to causation, we ask whether a trier of fact could rationally find that the City's breach, if any, proximately caused damage to the Bordens. Taken in the light most favorable to the Bordens, the record shows that flooding started the first winter after the 1995 project was completed. The flooding recurred each winter for the next several years. The flooding subsided when another drainage facility began channeling water out of the Wetlands and into the headwaters of a nearby creek. This coincidence in timing gives rise to an inference that the flooding was a proximate result of the 1995 drainage project. Accordingly, we conclude that the Bordens have produced evidence sufficient to support a finding on each element of *Currens*' "due care exception," and that they are entitled to have a trier of fact decide whether that "exception" should be applied here.

## II

The Bordens allege claims for negligence, nuisance, trespass, inverse condemnation, and statutory waste. Their

---

[32] Four years after it designed and funded the project in issue here, according to Henry Borden's declaration, the City completed "a municipal drainage facility that drew waters out from the Royal Gardens Wetlands and conveyed them north across Fones Road into the headwaters of Woodland Creek." CP at 153. The City also employed large pumps on the Comstock property. In referring to these alternatives, we distinguish between their availability in 1993-95 and their actual use later on. Their availability is a factor for a trier of fact to consider when assessing whether the City used due care. Their actual use may or may not be admissible under ER 407.

negligence claim is controlled by *Currens*, and they are entitled to a trial on it for the reasons discussed in Section I. We turn now to their remaining claims, in order to minimize problems after remand.

■■ The Bordens assert a nuisance claim. To prove nuisance, a claimant must show an unreasonable interference with the use and enjoyment of property.[33] When the interference is blocking the claimant's drainage, it is deemed unreasonable only if it falls within an exception to the common enemy doctrine.[34] The only common enemy exception that might apply here is *Currens'* "due care exception," which is essentially a limited cause of action for negligence. Accordingly, the Bordens' nuisance claim is simply "a negligence claim presented in the garb of nuisance";[35] it need not be separately considered on remand; and the trial court did not err by dismissing it.

■ The Bordens assert a claim for trespass. Such a claim is viable "when there is an intentional or negligent intrusion onto or into the property of another."[36] The Bordens do not claim that water from the 1995 drainage project actually invaded their property on the surface. As they acknowledge, they can show only that water from the 1995 drainage project "supercharged" the ground so that water that would otherwise have drained from their property failed to do that. These facts will not sustain their claim for trespass, and the trial court did not err by dismissing it.

---

[33] *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 592, 964 P.2d 1173 (1998); *Bodin v. City of Stanwood*, 79 Wn. App. 313, 318 n.2, 901 P.2d 1065 (1995).

[34] *Currens*, 138 Wn.2d at 861-62.

[35] *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 527, 799 P.2d 250 (1990); *Kaech v. Lewis County Pub. Util. Dist. No. 1*, 106 Wn. App. 260, 281, 23 P.3d 529 (2001); *Lewis v. Krussel*, 101 Wn. App. 178, 183, 2 P.3d 486 (2000).

[36] *Mielke v. Yellowstone Pipeline Co.*, 73 Wn. App. 621, 624, 870 P.2d 1005 (1994); *Phillips*, 136 Wn.2d at 958; *Hedlund v. White*, 67 Wn. App. 409, 418 n.12, 836 P.2d 250 (1992).

 The Bordens assert a claim for inverse condemnation. To prove inverse condemnation, a claimant must show a taking.[37] A claimant cannot do that merely by showing a "tortious interference" with the use or enjoyment of the property.[38] Instead, he or she must show, insofar as pertinent here, an interference that is permanent or recurring,[39] and that destroys or derogates from "one or more fundamental attributes of property ownership."[40] No such interference is shown here, and the trial court did not err by dismissing this claim.

 Finally, the Bordens claim statutory waste under RCW 4.24.630. By that statute's plain terms, a claimant must show that the defendant "wrongfully" caused waste or injury to land, and a defendant acts "wrongfully" only if he or she acts "intentionally." The evidence here does not support an inference that the City intentionally, as opposed to negligently, caused waste or injury to the Bordens' land. Accordingly, the trial court did not err by dismissing this claim.

The judgment dismissing the negligence claim is reversed, and that claim is remanded for further proceedings. The judgment is affirmed in all other respects. Each party having prevailed in part, neither shall receive costs on appeal.

HUNT, C.J., and ARMSTRONG, J., concur.

---

[37] *Phillips*, 136 Wn.2d at 957 (citing *Pierce v. N.E. Lake Wash. Sewer & Water Dist.*, 69 Wn. App. 76, 79, 847 P.2d 932 (1993)); *Granite Beach Holdings, L.L.C. v. Dep't of Natural Resources*, 103 Wn. App. 186, 205, 11 P.3d 847 (2000) (citing *Bodin v. City of Stanwood*, 79 Wn. App. 313, 320, 901 P.2d 1065 (1995), aff'd, 130 Wn.2d 726 (1996)); *Gaines v. Pierce County*, 66 Wn. App. 715, 725, 834 P.2d 631 (1992).

[38] *Gaines*, 66 Wn. App. at 725; *N. Pac. Ry. v. Sunnyside Valley Irrigation Dist.*, 85 Wn.2d 920, 924, 540 P.2d 1387 (1975).

[39] *Gaines*, 66 Wn. App. at 725, *Miotke v. City of Spokane*, 101 Wn.2d 307, 334, 678 P.2d 803 (1984); *N. Pac. Ry.*, 85 Wn.2d at 924.

[40] *Margola Assocs. v. City of Seattle*, 121 Wn.2d 625, 643-44, 854 P.2d 23 (1993); *Guimont v. Clarke*, 121 Wn.2d 586, 602, 854 P.2d 1 (1993); *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 329-30, 787 P.2d 907 (1990).