[Nos. 45742-3-II; 46562-1-II. Division Two. July 14, 2015.]

GREG HOOVER, *Respondent*, v. SCOTT WARNER ET AL.,
*Appellants*.

*David J. Corbett* (of *David Corbett PLLC*), for appellant.
*John M. Morgan* (of *Worth Law Group*), for respondents.

¶1 JOHANSON, C.J. — Scott and Ernest Warner appeal a trial court's ruling finding them liable for negligence, nuisance, and trespass after their road grading project caused damage to Greg Hoover's property by impeding the natural flow of surface and subsurface waters. The Warners also appeal the permanent injunction entered in connection with the trial court's ruling, the court's decision requiring them to design and implement a remediation plan, and the court's award of fees and sanctions in Hoover's favor.

¶2 We hold that (1) substantial evidence supported each of the trial court's critical findings of fact, (2) the common enemy doctrine does not shield the Warners from liability because the "due care" exception applies, (3) the trial court properly found the Warners liable for damages caused to Hoover, (4) the trial court abused its discretion by granting an overly broad injunction, (5) the trial court did not abuse its discretion by awarding sanctions under CR 37(c), and (6) the Warners have waived any challenge to the remediation plan. Accordingly, we affirm in part and reverse in part.

## FACTS

### I. Background

¶3 Hoover purchased 7.5 acres of property in Yelm in 1999. Ernest[1] owns a 20-acre parcel that borders the west and north sides of Hoover's property. Water naturally drains downward from Hoover's property onto Ernest's property in a north by northwest direction, with some of the water draining across Hoover's westernmost boundary.

¶4 Before 2006, Hoover's property did not suffer from "ponding" or standing-water accumulation because of the natural composition of the surrounding soil. The soil on Hoover's property comprises a permeable layer of organic material on top of an impermeable layer known as "silt loam," which developed from sediment in a glacial lake bed. With soil such as Hoover's, water typically drains by flowing through the uppermost organic layers until it reaches the impermeable silt loam, where it then travels in whichever direction is naturally sloped downward.

¶5 In 2006, the Warners commenced a development project on the portions of their property abutting Hoover's. According to Hoover, the project involved the creation of a new road adjacent to the western property line. Hoover understood that the Warners intended to clear the road as a way to gain access to a segment of their property that the Warners intended to subdivide. Hoover witnessed the Warners using dump trucks and heavy equipment to deposit and compact fill material to form the road. Hoover believed that the Warners knew that filling and grading that area would result in adverse drainage consequences to Hoover's property.

¶6 But according to the Warners, they transported no fill material into the area and they used heavy equipment only

[1] Where necessary, we refer to Scott and Ernest Warner by their first names for clarity. We intend no disrespect.

to "blade" vegetation off an existing roadway. The Warners claimed that they did nothing to change the grade on either the northern or western property lines.

¶7 Shortly after the Warners completed their work, Hoover began to notice water collecting on his property. Hoover informed Scott that his property would not drain properly and requested that Scott do something to alleviate the growing problem. Over the course of the next few years, the Warners dug a series of ditches along the road to attempt to mitigate Hoover's drainage issues. While these ditches removed some of the pooling water, the Warners refused Hoover's request to dig additional ditches, citing their ineffectiveness. Instead, according to Hoover, the Warners promised to remove the road.

¶8 Ultimately, however, the Warners declined to remove the road, in part because Hoover complained to the Department of Ecology and the Department of Labor and Industries regarding the Warners' projects. Meanwhile, Hoover's drainage problems worsened.

¶9 The saturated soil caused the well that served Hoover's home to collapse and his septic system to fail. The encroaching water cracked the foundation in Hoover's home and invaded his crawl space. The water also reduced Hoover's available space to graze his horses. Thurston County then served Hoover with a violation notice after Scott complained that Hoover's septic tank failure caused waste to spill into roadside ditches.

¶10 In 2013, Hoover brought suit alleging several causes of action, including timber trespass, statutory waste, nuisance, trespass, and negligence. Hoover also sought temporary and permanent injunctive relief to preclude the Warners from continuing to impede his property's ability to drain and to prevent ongoing damage.

## II. PROCEDURE

¶11 Before trial, as the parties conducted discovery, the Warners responded to two requests for admission from Hoover that are relevant to this appeal:

> ***REQUEST FOR ADMISSION NO. 1***: Admit that in 2006 you or others under your direction and control caused rock and fill material to be brought in from off site and deposited at one or more locations within the area circled and labeled "A" on attached Exhibit 1.
>
> ***RESPONSE***:
>
> **DENY**
>
> ***REQUEST FOR ADMISSION NO. 2***: Admit that in 2006 you or others under your direction and control caused rock and fill material to be brought in from off site and deposited at one or more locations within the area circled and labeled "B" on attached Exhibit 1.
>
> ***RESPONSE***:
>
> **DENY**

Clerk's Papers (CP) at 430-31.

¶12 At trial, the court heard extensive testimony involving several critical issues. Among these were the existence and use of fill material; the natural pattern of water flow between the two properties; whether the Warners' grading work did in fact impede that natural flow to cause Hoover's drainage complications; the efficacy of existing remedial measures and the availability of future remedial efforts; and what, if any, damages Hoover suffered.

### A. USE OF FILL MATERIAL

¶13 As to the use of fill material, Hoover explained that during the Warners' 2006 project, he observed the Warners using dump trunks and heavy machinery to dump, spread, and compact an extensive amount of foreign fill material along the western boundary of his property to create a new

road. In 2006, this new road raised the level of the ground as much as two feet. Hoover estimated that he saw the Warners use as many as 30 to 50 dump truck loads of material for this purpose.

¶14 Several of Hoover's current and former neighbors corroborated his version of the events. Scott Hyderkhan, who owned property north of Hoover's in 2006, recalled witnessing the Warners "continuously" dump loads of large rock for what in his view was "hundreds of feet." 1 Report of Proceedings (RP) at 65. Linda Seamount, Hyderkhan's girlfriend, also noticed Ernest dumping truckloads of rocks and gravel. Likewise, Jerry Hoover,[2] another nearby property owner, saw the Warners dumping fill dirt and rock in connection with the grading activity in 2006.

¶15 Other qualified witnesses also testified in support of Hoover's allegations. Joseph Vincent McClure, a structural engineer, opined that the road comprised recent fill. Similarly, Robert Manns, a Thurston County land use compliance coordinator, explained that he observed two or three feet of fill material, which he noticed because of the difference in height between the fill and the natural ground. Finally, Lisa Palazzi, Hoover's soil physics and hydrology expert, determined that fill material had been deposited as part of the 2006 project on a "more-probable-than-not" basis. 2 RP at 275.

¶16 But the Warners denied having brought fill material in, claiming instead that they were simply performing maintenance work on an existing road.[3] William Halbert, the Warners' expert hydrologist, acknowledged the presence of fill by digging several "test pits," but he opined that the material existed in the subject locations for at least 20 years. In Halbert's view, the material looked consistent with ground having been disturbed by "blading."

---

[2] Jerry Hoover is not related to Greg Hoover.

[3] Later in trial, Ernest admitted that he remembered hauling some rock to cover a culvert. This admission appears to relate to work performed on the northern property boundary.

## B. Project's Impact

¶17 As to the project's impact, Halbert and Palazzi generally agreed that the direction of the drainage and water flow is north and northwest across Hoover's property, but they disagreed regarding the extent of the impact that the Warners' grading project had on the otherwise natural occurrence. According to Halbert, the material in the western road was highly permeable and would not have been compacted enough by the heavy machinery to obstruct natural drainage.

¶18 In Halbert's view, it was not the Warners' project that caused the ponding and other adverse drainage issues. Instead, he opined that the source of the problem was overgrazing and compacting of the surrounding soil by Hoover's several horses, a problem that could be remedied by "rip-[ping]" and revegetating the surrounding soil. 3 RP at 427. Halbert also believed that the existing ditches appeared to be sufficiently deep to alleviate ponding problems.

¶19 Palazzi was of a different mind. She observed standing water on Hoover's property and opined that the 2006 fill material had blocked natural flow pathways. Palazzi explained further that compacting and "smearing" by the Warners' heavy machinery exacerbated the drainage issues. Specifically, Palazzi testified that the presence of additional fill and the accompanying increased elevation impeded the surface water flow while the heavy machinery compaction obstructed the subsurface flow. According to Palazzi, an engineering solution was necessary to restore the normal drainage pathways because the existing ditches were not adequate to allow water to drain west of Hoover's property. Palazzi also suggested future monitoring as part of any remedial effort.

¶20 Furthermore, Martha Carroll, from whom Hoover had purchased his property, explained that she had never

experienced problems with standing water or flooding during her time living on the property. During a recent visit to the property, she observed standing water and noticed that the land had sunk "a lot." 2 RP at 119. Carroll also remarked that the "berm" on the west side of the property had not been there when she owned the home and that there was never a road on the western property line.

## C. Ruling and Findings

¶21 Following trial, the court issued a letter ruling. The trial court concluded that it was persuaded by a preponderance of the evidence that the Warners had brought in rock or other material to perform significant work along the northern and western boundaries of Hoover's property in 2006. The court acknowledged that because of the gentle slope of the land, even a slight impact would have a "significant effect on the flow of rainwater off the Hoover parcel." CP at 277.

¶22 The trial court also found that Hoover did not have considerable problems with standing water until after the Warners' 2006 project and that Hoover's adverse surface and subsurface drainage situation starting immediately thereafter did not appear to be coincidental. Of the two experts, the trial court found more credible Palazzi's explanation that surface and subsurface water flow from Hoover's property to Ernest's had been reduced or eliminated.

¶23 Regarding the Warners' assertion that they were shielded from liability by the "common enemy" doctrine, the trial court ruled that the Warners took no action to mitigate the damage until Hoover brought it to their attention, at which point they dug, or allowed Hoover himself to dig, rudimentary ditches. The court considered the low level of utility of the project, the minimal mitigation efforts, and the significant impact on Hoover to support its conclusion that the Warners' actions were not reasonable and that they did

not act in good faith and in a manner to avoid unnecessary damage to Hoover's property.

¶24 The trial court awarded Hoover $156,000 representing the diminution in value of his property, but it conditioned that award on the Warners' inability to remedy the damage. The court permitted the Warners to purge the judgment by retaining a professional and designing a plan to restore the drainage pathways. Additionally, the trial court awarded Hoover $25,000 in general damages, $12,000 for repairs, and $60,000 for loss of use and enjoyment.

¶25 The trial court also awarded Hoover attorney fees under CR 37(c)—the rule that governs a party's failure to admit the truth of a matter during discovery—because the Warners denied using fill materials in their responses to Hoover's requests for admission. Moreover, the trial court permanently enjoined the Warners from undertaking any further action to adversely affect the drainage on Hoover's property.

¶26 The trial court entered findings of fact and conclusions of law consistent with the foregoing. Ultimately, the court found the Warners liable on Hoover's theories of negligence, nuisance, and trespass.

¶27 In compliance with the trial court's order, the Warners submitted a remediation plan, which the court approved. But the trial court then imposed a requirement that the Warners regularly inspect and maintain the drainage system—at least annually—to ensure its function. The parties later stipulated to the success of the remediation plan. The Warners appeal.

## ANALYSIS

### I. Substantial Evidence To Support the Trial Court's Findings of Fact

¶28 The Warners contend that substantial evidence does not support the trial court's finding of fact that water

drained off the surface of the Hoover parcel to the north or northwest prior to 2006. The Warners assert further that substantial evidence does not support the trial court's finding of fact that subsurface water drained underground from the Hoover property to the Warner property. We hold that substantial evidence supports each challenged finding because the evidence demonstrates that a rational trier of fact could conclude that both surface and subsurface water flowed as described.

¶29 We review a trial court's findings of fact for substantial evidence to support the findings and then determine whether those findings of fact support its conclusions of law. *Scott's Excavating Vancouver, LLC v. Winlock Props., LLC*, 176 Wn. App. 335, 341, 308 P.3d 791 (2013), *review denied*, 179 Wn.2d 1011 (2014). "Substantial evidence" is the quantum of evidence "sufficient to persuade a rational fair-minded person the premise is true." *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).

¶30 We make all reasonable inferences from the facts in Hoover's favor as the prevailing party below. *Scott's Excavating*, 176 Wn. App. at 342. We review the trial court's conclusions of law de novo. *Scott's Excavating*, 176 Wn. App. at 342. We will not "disturb findings of fact supported by substantial evidence even if there is conflicting evidence." *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). And we defer to the trial judge on issues of witness credibility and persuasiveness of the evidence. *Boeing Co. v. Heidy*, 147 Wn.2d 78, 87, 51 P.3d 793 (2002).

## A. Surface Water

¶31 The Warners challenge the trial court's findings that surface and subsurface water drained naturally from the north and northwest, across Hoover's property and onto the Warners' property before 2006. Regarding drainage of surface water, the Warners appear to challenge finding of fact 1.4. Finding 1.4 provides in pertinent part,

1.4 Surface and sub-surface drainage runs naturally across the Hoover property to the north and northwest. From the time of his purchase until 2006, Hoover did not have any problems with flooding or water gathering on his property.

CP at 429. The crux of the Warners' challenge is that the evidence does not support the finding that surface water drains in this direction because Hoover did not actually see surface water draining from his property to the Warners' property.

¶32 But experts who testified on behalf of both Hoover and the Warners agreed that water naturally flowed across Hoover's property in a north by northwest direction. And both Palazzi and McClure, a structural engineer, spoke specifically to the fact that this drainage pathway includes surface waters. Specifically, according to McClure, "the vast majority of the flow on this site would be on the surface." 2 RP at 159. Accordingly, a rational trier of fact could conclude that water drained off the surface of the Hoover property to the north and the northwest and, therefore, we hold that substantial evidence supports the trial court's finding.

## B. Subsurface Water

¶33 The Warners also contend that because no party undertook an investigation specifically to determine whether subsurface water traveled in the same direction as surface water, the trial court's causation findings regarding the subsurface water flow are not supported by substantial evidence. The relevant findings of fact are findings 1.12 and 1.13, which provide,

1.12 The Warners' 2006 grading project altered and changed the preexisting drainage in a manner that impeded the free flow of surface and subsurface water off of Hoover's property, causing water to collect on the Hoover property, where it did not collect before.

1.13 These activities directly and proximately caused excessive moisture conditions and ongoing damage to the Hoover

property, including: damage to the home foundation; failure of the septic system; failure of the well; and loss of use and enjoyment of the property.

CP at 431.

¶34 But practically speaking, the Warners' assertion is essentially that because there is no direct evidence that subterranean water traveled north and west from Hoover's property onto the Warners' property, substantial evidence necessarily does not support the trial court's finding to that extent. The Warners rely in part on *Nejin v. City of Seattle*, 40 Wn. App. 414, 698 P.2d 615 (1985), to support their claim.

¶35 In *Nejin*, Valentina Nejin sued the city of Seattle for negligence alleging that a broken sewer line in the vicinity of her property caused landslide damage. 40 Wn. App. at 415. But expert testimony revealed that although excess water from a broken sewer could cause landslides, the effect of escaping water would be substantially diminished beyond 50 feet and the landslide occurred 240 feet from the broken sewer. *Nejin*, 40 Wn. App. at 420. Moreover, experts testified that the landslide could have been caused by other soil problems. *Nejin*, 40 Wn. App. at 420.

¶36 Division One of this court reversed the trial court's award of damages because although the broken sewer pipe could *theoretically* have contributed to Nejin's landslide, there was no direct evidence that it had done so and, thus, a causation theory based on circumstantial evidence that the broken sewer caused the damage was purely conjecture. *Nejin*, 40 Wn. App. at 421. And where liability is premised on a theory of causation based on circumstantial evidence, no factual determination may rest on conjecture. *Nejin*, 40 Wn. App. at 420 (quoting *Sanchez v. Haddix*, 95 Wn.2d 593, 599, 627 P.2d 1312 (1981)).

¶37 Here, however, the experts agreed that water flowed downhill from Hoover's property to the Warners' property. There is no disagreement that Hoover's property slopes to the north and west and no dispute that water drains

through the soil to reach an impermeable layer and then travels "downslope." Palazzi testified specifically regarding the need to restore the original drainage pathways, including the subsurface pathways, toward the north and the northwest. In Palazzi's view, the 2006 grading project impacted both surface and subsurface drainage pathways. From this evidence, a rational finder of fact could conclude that the asserted premise (that subsurface water flows in the same direction as the surface water) is true.

¶38 Furthermore, although Hoover may have relied on circumstantial evidence to establish that the Warners' grading project impeded the flow of subsurface water from his property, such a theory was not purely conjecture. It was the unequivocal opinion of an expert witness. Moreover, even had the subsurface water from Hoover's property drained in a direction away from the Warners' property, substantial evidence would nevertheless support the trial court's finding regarding the grading project as the cause of Hoover's standing water. This is so because Hoover has shown that the obstruction of surface water alone supports such a finding. Accordingly, we hold that substantial evidence supports the challenged findings.

## II. COMMON ENEMY DOCTRINE

¶39 The Warners next argue that even if substantial evidence exists to support the trial court's finding that the grading project caused Hoover's damage, the Warners are nevertheless absolved from liability by virtue of the common enemy doctrine. Hoover responds that the common enemy doctrine does not shield the Warners from liability because the trial court correctly concluded that the "due care" exception to the doctrine applied. We assume, as the parties and the trial court did, that the common enemy doctrine applies here. And we agree with Hoover that the "due care" exception to the doctrine applies.

¶40 "In its strictest form, the common enemy doctrine allows landowners to dispose of unwanted surface water in

any way they see fit, without liability for resulting damage to one's neighbor." *Currens v. Sleek*, 138 Wn.2d 858, 861, 983 P.2d 626, 993 P.2d 900 (1999). "The idea is that 'surface water . . . is regarded as an outlaw and a common enemy against which anyone may defend himself, even though by so doing injury may result to others.' " *Currens*, 138 Wn.2d at 861 (alteration in original) (quoting *Cass v. Dicks*, 14 Wash. 75, 78, 44 P. 113 (1896)). However, because a strict application of this rule is widely regarded as inequitable, our Supreme Court has adopted exceptions to the common enemy doctrine over the years. *Currens*, 138 Wn.2d at 861-62.

¶41 Although landowners may block the flow of diffuse surface water onto their land, the first exception provides that landowners may not inhibit the flow of a watercourse or a natural drainway.[4] *Island County v. Mackie*, 36 Wn. App. 385, 388, 675 P.2d 607 (1984). Another exception prevents landowners from collecting water and channeling it onto their neighbors' land. *Currens*, 138 Wn.2d at 862 (citing *Wilber Dev. Corp. v. Les Rowland Constr., Inc.*, 83 Wn.2d 871, 875, 523 P.2d 186 (1974), *overruled by Phillips v. King County*, 136 Wn.2d 946, 968 P.2d 871 (1998)).

¶42 Our Supreme Court first recognized a third exception—the exception at issue here—in *Currens*. There, the Currenses urged the court to formally recognize that the common enemy doctrine shields only reasonable conduct; that is, a landowner who acts unreasonably may be liable for damages caused by surface water flooding. *Currens*, 138 Wn.2d at 863. The Supreme Court agreed, concluding, with regard to the third exception, that "[a]lthough it does not affect a landowner's ability to alter the flow of surface water, it does require avoidance of unneces-

---

[4] We note that a viable argument could be made that the Warners' project inhibited the flow of a natural drainway such that the first exception may also apply under the circumstances present here. But no party argues or otherwise suggests that it does, and the trial court made rulings concerning only the due care exception discussed herein. Therefore, we limit our review accordingly.

sary infringement upon a neighbor's free enjoyment of his or her property." *Currens*, 138 Wn.2d at 864.

¶43 Therefore, according to this "due care" exception, landowners may improve their land free from liability for damages caused by the change in the flow of surface water[5] onto neighboring property so long as the landowners act in good faith and avoid unnecessary damage to the property of others. *Currens*, 138 Wn.2d at 864. The due care exception "thus serves to cushion the otherwise harsh allocation of rights under the common enemy doctrine." *Currens*, 138 Wn.2d at 864.

¶44 At the same time that the *Currens* court unequivocally adopted the due care exception, it also rejected an invitation to depart from its common enemy doctrine jurisprudence in favor of the "reasonable use rule." 138 Wn.2d at 866. The hallmark of the reasonable use rule is that it requires courts to weigh the utility of the improvements against the resulting damage to adjacent properties. *Currens*, 138 Wn.2d at 866.

¶45 Here, it is precisely because the trial court apparently indulged in this consideration of the project's utility that the Warners allege error. Regarding the due care exception, the trial court found as follows:

> 1.15 The Warners' filling and grading improvements do not serve any particular utility on the Warner property. Defendants took no action to mitigate any rainwater flow until after it was brought to their attention by Plaintiff. At that point, Defendants either dug themselves or allowed the Plaintiff to dig some rudimentary ditches through the roadway. These ditches have proven largely ineffective to ameliorate negative impacts to Hoover's property. Considering the low level of utility of the project, the significant impact on Plaintiff, and the minimal mitigation efforts that were undertaken, the Court finds that the Defendants' actions were not reasonable. They were not

---

[5] Assuming that any change in flow is not caused by inhibiting the flow of a natural watercourse or drainway. *Mackie*, 36 Wn. App. at 388.

taken in good faith and in a manner to avoid unnecessary damage to Plaintiff.

CP at 431. Because the trial court referenced the utility of the project and the impact it had on Hoover's property, the Warners contend that, in effect, the trial court erroneously adopted the reasonable use rule and, therefore, reversal is required.

¶46 But we decline to reverse on this ground for two reasons. First, the trial court's references to "utility" and "impact" were superfluous because the court also considered (consistent with what the due care exception contemplates) the fact that the Warners took no action to mitigate the damages from the grading project until Hoover requested their assistance to alleviate the adverse drainage consequences. And in doing so, the trial court also noted that the ditches in the roadway were "rudimentary" and "largely ineffective." The court then concluded that the Warners' actions were not reasonable and were not taken in good faith and in a manner to avoid unnecessary damage to Hoover.[6]

¶47 Second, we may affirm on any ground supported by the record. *Wash. Fed. Sav. & Loan Ass'n v. Alsager*, 165 Wn. App. 10, 14, 266 P.3d 905 (2011). To the extent that the trial court erred by referring to the "utility" of the grading project, the record nevertheless contains facts to support the application of the due care exception.

¶48 Our decision in *Borden v. City of Olympia*, 113 Wn. App. 359, 53 P.3d 1020 (2002), is instructive.[7] There, the Bordens, whose property lay in a drainage basin, sued the city of Olympia when the city assisted a private developer's efforts to build a stormwater drainage project.

---

[6] In its letter ruling, the trial court also clearly cited the correct passage from *Currens* setting out what courts must find to apply the due care exception.

[7] We also mentioned in *Borden* that the adoption of the due care exception essentially signifies that Washington now recognizes a negligence cause of action for altering the flow of naturally occurring surface and ground water. 113 Wn. App. at 368.

*Borden*, 113 Wn. App. at 363. The Bordens experienced considerable flooding each winter for several years after the project's completion. *Borden*, 113 Wn. App. at 364. The city ultimately remedied the problem, but the Bordens brought suit in part based on the common enemy doctrine. *Borden*, 113 Wn. App. at 365. The Bordens asserted that the drainage system created additional discharges into the surrounding wetlands which exceeded the soil's capacity to accept them and resulted in raising the water table under the Bordens' own property. *Borden*, 113 Wn. App. at 365.

¶49 We reversed an order granting summary judgment in favor of the city in part because the city could have taken measures to properly analyze the drainage capabilities and could have realized that alternatives existed. *Borden*, 113 Wn. App. at 372. We concluded that a rational trier of fact could find that the city did not use due care to minimize the Bordens' damages. *Borden*, 113 Wn. App. at 372.

¶50 Similarly, here, the record contains no facts to support the notion that the Warners did any investigation or conducted any study to determine whether their grading project would have any adverse impact on the ability of Hoover's property to drain. And as the trial court recognized, once they became aware of the issue, the Warners did little to mitigate the damage. In fact, Scott contacted Thurston County to levy a complaint against Hoover for septic failures stemming from the flooding that his own project caused.

¶51 And despite some suggestion that the Warners initially agreed to remove the road, Ernest testified that they refused to continue cooperating with Hoover after Hoover levied complaints against them. Consequently, the Warners cannot be said to have used due care to avoid unnecessary damage to Hoover. Accordingly, we hold that the Warners' argument fails for one of the two aforementioned reasons.

## III. Trespass

 ¶52 The Warners next argue that because they caused no intentional or negligent intrusion of water onto Hoover's property, the trial court erred by ruling that they committed trespass. But Washington courts treat claims for trespass and negligence arising from a single set of facts as a single negligence claim. *Hurley v. Port Blakely Tree Farms LP*, 182 Wn. App. 753, 772, 332 P.3d 469 (2014), *review denied*, 182 Wn.2d 1008 (2015). Because the trial court here found liability under trespass and negligence, reversal is not required even if trespass was not committed.

## IV. Injunctive Relief

¶53 The Warners further argue that because the trial court's ruling precludes the Warners from engaging in activity that has any adverse effect on Hoover's drainage, the trial court entered an impermissibly broad injunction. We agree.

 ¶54 We review a trial court's decision to grant an injunction and the terms contained in the injunction for abuse of discretion.[8] *Kucera v. Dep't of Transp.*, 140 Wn.2d 200, 209, 995 P.2d 63 (2000). Trial courts have broad discretionary power to fashion injunctive relief to fit the particular circumstances of the case before it. *Rupert v. Gunter*, 31 Wn. App. 27, 30, 640 P.2d 36 (1982). A trial court necessarily abuses its discretion if the decision is based on untenable grounds or the decision is manifestly unreasonable or arbitrary. *Kucera*, 140 Wn.2d at 209.

 ¶55 " '[O]ne who seeks relief by temporary or permanent injunction must show (1) that he has a clear legal or equitable right, (2) that he has a well-grounded fear of immediate invasion of that right, and (3) that the acts

---

[8] We exercise our discretion under RAP 2.5 to review this arguably unpreserved error.

complained of are either resulting in or will result in actual and substantial injury to him.' " *Kucera*, 140 Wn.2d at 209 (alteration in original) (internal quotation marks omitted) (quoting *Tyler Pipe Indus., Inc. v. Dep't of Revenue*, 96 Wn.2d 785, 792, 638 P.2d 1213 (1982)). Here, regarding injunctive relief, the trial court concluded as a matter of law that "[d]efendants are permanently enjoined from undertaking any further actions on the Warner property that adversely affect the drainage on the Hoover property." CP at 433.

¶56 Hoover fails to establish the first factor and, therefore, the trial court abused its discretion by granting the injunction insofar as it is currently written. As mentioned, unless one of the three recognized exceptions applies, the common enemy doctrine entitles property owners to develop their land without regard for the drainage consequences to other landowners. *Currens*, 138 Wn.2d at 861.

¶57 Accordingly, the enjoining language is overly broad because it precludes the Warners from engaging in conduct to which they are entitled by law. Although Hoover has a legal right to be free from *negligent* acts that adversely affect his property's drainage, he is not entitled to injunctive relief that precludes *all* or *any* act that may cause such results. Therefore, the trial court abused its discretion by granting an overly broad injunction. We vacate the injunction.

V. ATTORNEY FEES UNDER CR 37(c)

¶58 The Warners next contend that the trial court abused its discretion by awarding attorney fees pursuant to CR 37(c) because (1) the admission sought was of no substantial importance, (2) the Warners' failure to admit did not cause Hoover to incur additional expenses, and (3) even if warranted, the expenses exceeded a reasonable amount. We disagree.

¶59 We review a trial court's decision to impose discovery sanctions under CR 37(c) for an abuse of discretion. *Rivers v. Wash. State Conf. of Mason Contractors*, 145 Wn.2d 674, 684, 41 P.3d 1175 (2002). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. *Thompson v. King Feed & Nutrition Serv., Inc.*, 153 Wn.2d 447, 460, 105 P.3d 378 (2005) (plurality opinion).

¶60 CR 37(c) provides that if a party fails to admit the truth of any matter as requested under a CR 36 request for admission and the matter is subsequently proved, the party may apply to the trial court for an order requiring the other party to pay reasonable expenses incurred in making that proof, including attorney fees. The trial court may then order payment unless it finds that (1) the request was held objectionable pursuant to CR 36(a), (2) the admission sought was of no substantial importance, (3) the party failing to admit had reasonable ground to believe the fact was not true or the document was not genuine, or (4) there was other good reason for the failure to admit. CR 37(c); *Thompson*, 153 Wn.2d at 460.

¶61 Here, the trial court found by a preponderance of the evidence that some rock and/or other material was brought in and deposited in the areas to the north and to the west of the Hoover property. The court concluded that the requests for admission were of substantial importance and that none of the exceptions in CR 37(c)(1)-(4) applied. The trial court awarded fees in the amount of $32,714.85.

¶62 The record supports these findings. Hoover's allegations depended almost entirely on the fact that the Warners dumped, spread, and compacted fill material along the natural drainage paths abutting his property. The existence of fill material was an issue of substantial importance for Hoover's case. The Warners' contention that Hoover incurred no additional expenses is equally unavailing. Hoover took depositions and called additional witnesses at trial solely so that the court could hear testimony regarding fill material from someone other than Hoover himself.

¶63 Finally, pursuant to CR 37(c), trial courts are permitted to award "reasonable" expenses and attorney fees. CR 37(c). What is reasonable depends on the circumstances of each case and we do not substitute our judgment for that of the trial court. We hold that the trial court did not abuse its discretion by awarding fees under CR 37(c) because the fill material issue was central to the resolution of the case, Hoover incurred additional expenses in making his proof, and the trial court did not abuse its discretion in ordering a reasonable amount.

## VI. MAINTENANCE AND INSPECTION

¶64 Finally, the Warners argue that the trial court erred by requiring them to inspect and maintain the ditches built as part of the remedial plan to abate Hoover's drainage complications. The Warners assert that because they are not liable for Hoover's damages, there is no basis on which the trial court could fairly impose the inspection condition. We disagree.

¶65 After the trial court ordered a remedial plan as an alternative to damages, the parties agreed on a plan that called for a drainage system to ameliorate Hoover's water damages. The court-approved order contained the condition that "[d]efendants shall regularly inspect and maintain the drainage system (at least annually) to ensure that it functions." CP at 504. This order became part of the court-approved final acceptance order signifying the completion of the remediation plan. Both parties stipulated to the final order with its accompanying conditions. We hold that the Warners waived the right to challenge those conditions for the first time on appeal.

## VII. ATTORNEY FEES

¶66 Hoover requests additional attorney fees pursuant to CR 37(c) on appeal. But we may award such fees as an additional sanction if the appeal of the trial court's

sanctions is frivolous or taken for delay. *Rhinehart v. KIRO, Inc.*, 44 Wn. App. 707, 711, 723 P.2d 22 (1986). Here, the Warners' challenge to the amount of fees was a reasonable challenge and was, therefore, not frivolous. Accordingly, we award no additional fees.[9]

¶67 In conclusion, we vacate the impermissibly broad injunction, but we affirm the trial court in all other respects. Additionally, we decline to award attorney fees on appeal.

BJORGEN and SUTTON, JJ., concur.

Reconsideration denied August 18, 2015.

Review denied at 185 Wn.2d 1004 (2016).

---

[9] Similarly, Hoover requests fees for his efforts to respond to the Warners' challenge to the trial court's finding of fact 1.11, which he deems frivolous. But that is the same finding on which the trial court based its award of fees under CR 37(c). For the reasons explained above, we decline to award additional fees on this basis.