# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MILL CREEK CONSTRUCTION, INC, a Washington Corporation, | No. 55658-8-II (consolidated with No. 56118-2-II) |
| Appellant/Cross-Respondent, | |
| v. | |
| GARY L. WELDON, | |
| Respondent/Cross-Appellant. | |
| GARY L. WELDON, | UNPUBLISHED OPINION |
| Respondent/Cross-Appellant, | |
| v. | |
| JAMES SCHOUTEN and JANE DOE SCHOUTEN, husband and wife, | |
| Appellant/Cross-Respondent, | |
| TRAVELERS CASUALTY AND SURETY COMPANY, a Connecticut corporation, | |
| Third Party Defendant. | |

GLASGOW, C.J.—Gary Weldon hired Mill Creek Construction Inc. to build a house. After several disputes about the quality of the construction, Weldon terminated the contract and stopped making payments. Mill Creek filed a construction lien, sued Weldon for his failure to pay the amount due under the contract, and sought foreclosure of the lien. Weldon counterclaimed for offset damages to repair and complete Mill Creek's defective work.

After a bench trial, the trial court found that Mill Creek breached the contract by defectively constructing or failing to construct several parts of the house, but the trial court also found that Mill Creek's breach of the contract was not material. The trial court concluded that Weldon also breached the contract by terminating Mill Creek without a sufficient basis.

The trial court awarded Mill Creek approximately $105,000 in damages and awarded Weldon approximately $113,000 in offset damages, with a net judgment for Weldon of about $8,000. The trial court ruled that no party substantively prevailed and denied Mill Creek's request to foreclose the lien. The trial court awarded Weldon limited attorney fees under chapter 4.84 RCW but declined to award him full attorney fees under the contract.

On appeal, Mill Creek argues the trial court erred by excluding one of Mill Creek's expert witnesses. It also contends the trial court erred by finding that Mill Creek failed to install footing drains and defectively installed a sill plate, by not enforcing a right to repair provision in the contract, and by denying foreclosure on the lien. Finally, it asserts that the trial court erred by awarding Weldon attorney fees.

Weldon cross appeals, arguing the trial court erred by finding that Mill Creek's breach of the contract was not material. Both parties insist that the trial court erred by concluding that no party substantially prevailed and denying their requests for full attorney fees. Both parties seek attorney fees on appeal.

We hold that the trial court did not abuse its discretion by excluding the expert witness. Substantial evidence supported the findings that Mill Creek failed to install footing drains and defectively installed sill plates. The trial court also properly denied foreclosure of Mill Creek's lien.

2

Weldon did not assert the affirmative defense that Mill Creek materially breached the contract, but the parties presented evidence relevant to materiality and argued about materiality in closing, thereby trying the issue by consent. The trial court committed an error of law by not applying the material breach factors to determine whether Mill Creek materially breached the contract. We remand for the trial court to apply the materiality factors to the facts it has already found, the credibility determinations it has already made, and the evidence presented at trial. The trial court should then reevaluate whether Weldon substantially prevails and is entitled to full attorney fees. If the trial court determines that Weldon is a substantially prevailing party after remand, then he shall be entitled to his appellate attorney fees. We conclude that the trial court did not err when it declined to award Mill Creek attorney fees below. We otherwise affirm.

FACTS

A.    Background

Weldon hired Mill Creek to build a house in Jefferson County. Both parties signed a contract stating that Mill Creek would construct the house for approximately $614,000.[1] The contract incorporated "one custom-designed plan" from an architecture firm. Verbatim Report of Proceedings (VRP) (Aug. 3, 2020) at 25. The contract included a provision stating, "Mill Creek. . . retains the exclusive right to repair any defect." Clerk's Papers (CP) at 52.

The site of Weldon's house was on a steep hillside, and the ground was "excessively wet." VRP (Aug. 3, 2020) at 25. The contract stated that Mill Creek would construct footing drains and curtain drains. Footing drains are set directly next to the base of a building's foundation to drain

---

[1] Weldon argued below that this document was merely a proposal and no contract was formed, but the trial court disagreed and Weldon does not revive that argument on appeal.

water away from the walls of the building. Curtain drains are set some distance away from and below the foundation to drain water from the surrounding area.

The building plans for the house included specifications for the pony wall and sill plate, which meet perpendicularly to anchor the weight of the house on the foundation. An improperly anchored sill plate and pony wall can cause a house to slide off its foundation during a seismic event. The plans called for either a single 2 x 6 foot beam or two 2 x 4 foot beams in the pony wall to support the weight of the house. The plans did not specify what size beam to use for the sill plate. Mill Creek constructed the pony wall with 2 x 6 beams, with a 2 x 4 beam underneath a 2 x 6 beam for the sill plate. The 2 x 6 beam was not centered over the 2 x 4 beam, so the top beam hung out over the 2 x 4 on one side.

Mill Creek deviated from the building plans without Weldon's approval or knowledge several times. During the construction process, Weldon asked Mill Creek to correct several pieces of defective work that Mill Creek either explained away or refused to repair.

Inspectors from Jefferson County approved various aspects of the construction, including the footing drains, before issuing a certificate of occupancy. The county later issued a correction notice requesting a letter from an engineer "for bearing points where 2 x 4 sill plates support 2 x 6 walls above." Ex. 16. One of the architects who drafted the plans wrote a letter stating, "[W]e have been informed that a 2x4 sill plate has been used with 2x6 [] wall framing . . . . With the 2x6 bottom plate, we find this to be ok." Ex. 11. No architect from the firm ever visited the site. The county did not request any further information about the bearing capacity of the sill plate.

Weldon terminated the contract with Mill Creek in fall 2018, before the house was completed. In his e-mail, Weldon did not inform Mill Creek of any specific basis why he was

terminating the contract. James Schouten, Mill Creek's president, sent Weldon a letter stating, "I wish you would share with me what you feel is necessitating this [termination] other than just repeating to me to 'talk to my lawyer.'" Ex. 30. Weldon had made several payments but Mill Creek sent him a final payment request for materials delivered and labor performed, which totaled about $105,000. Weldon did not pay the bill.

In November 2018, Mill Creek filed a construction lien under chapter 60.04 RCW. In late 2018, Weldon hired an excavator, Martin Kithcart, to help with the "significant water intrusion underneath [the house's] foundation." VRP (Aug. 6, 2020) at 521. Tracy Gudgel, a civil engineer, visited the house in late 2018 or early 2019 with Kithcart to help investigate drainage and structural issues with the house. After visiting the house, Gudgel sent Weldon a construction detail for an additional curtain drain system. According to Weldon and Kithcart, Gudgel also agreed at that time to send Weldon a letter describing deficiencies in the construction. Even though Weldon followed up with him, Gudgel never provided the requested letter.

In February 2019, Mill Creek sued Weldon for breach of contract, seeking the amount of its final payment request to Weldon, foreclosure of the lien, and attorney fees. Weldon counterclaimed for fraud and unjust enrichment, seeking over $300,000 in offset damages. Weldon did not include an affirmative defense that Mill Creek had materially breached the contract in his answer, perhaps because he denied a contract existed. But he more broadly asserted Mill Creek's claim for relief was "barred in whole or in part by set-offs." CP at 7.

B.      Exclusion of Gudgel's Testimony

A few days before the bench trial, Mill Creek included Gudgel on its witness list as a lay witness that Mill Creek expected to "testify regarding his observations and opinions" of the

construction. CP at 26. Trial began on a Monday. Weldon did not receive the witness list until the Friday before trial began.

Weldon moved to exclude Gudgel's testimony on the first day of trial, arguing that Gudgel was an expert witness who Mill Creek disclosed too late and that there was a conflict of interest. Weldon argued that he confided in Gudgel by discussing "the drainage system and the failure to provide for a footing drain" as well as the sill plate and several other issues during Gudgel's visit. CP at 197. Weldon also filed a declaration explaining his relationship with Gudgel:

> I asked Mr. Gudgel if he could prepare a letter for me regarding the drainage system and the 2X4 mud sill under the 2X6 wall plate. He told me he had done work for [Mill Creek] in the past. Nonetheless, he said that he would provide me with a letter. I felt at that point that Tracy Gudgel was in my corner and he would be my expert.
> I waited a couple of weeks but I did not receive the letter so I called Mr. Gudgel. He told me again that he would write me a letter, but I never heard back from him[.]
> At that point I thought that I needed to move on and that I needed a different expert. I was surprised and disappointed when my lawyer told me that he had received the plaintiff's witness list . . . and that Tracy Gudgel was testifying for [Mill Creek].

*Id.*

Mill Creek never filed a written response to Weldon's motion, but Mill Creek argued that Gudgel would not be an expert because they did not expect him "to testify about any calculations," only "his observations of the site when he went out there." VRP (Aug. 5, 2020) at 377.

The trial court granted the motion to exclude, relying on *In re Matter of Firestorm 1991*, 129 Wn.2d 130, 916 P.2d 411 (1996),[2] involving an ex parte meeting with an expert who had been

---

[2] Four justices joined the lead opinion, and two concurrences from two other justices agreed with the lead opinion that the attorneys failed to conform to the requirements of CR 26(b)(5) by interviewing the expert witness ex parte without notice to opposing counsel or approval from the

hired by the plaintiff, and explaining, "I don't know who is telling the truth about what happened out at the property." VRP (Aug. 5, 2020) at 381.

C.    Trial

Mill Creek argued throughout the trial that the document the parties signed was a contract, that Weldon was not entitled to offset damages because he had not given Mill Creek the opportunity to repair its defective work as required under the contract, and that he was not entitled to terminate the contract. Schouten testified that what Weldon characterized as construction defects were actually measures to save money and energy, including the deviations from the plans for the sill plate and footing drains.

Weldon argued that the document he signed to hire Mill Creek was not a contract. He did not expressly argue that Mill Creek had materially breached any contract. Instead, Weldon contended that he could recover damages for repairing the defective construction and that Mill Creek could recover only the reasonable value of the benefit they had conferred on Weldon under the theory of quantum meruit. Weldon also argued that he had asked Mill Creek to fix defects he discovered in the construction of the house and he had been rebuffed or ignored. Therefore, he contended that he could recover offset damages against Mill Creek's construction lien for completing or repairing Mill Creek's work.

1.    Footing drains

Schouten testified that Mill Creek built footing drains around the foundation of Weldon's house. And an excavator subcontractor for Mill Creek testified that he installed a modified footing

---

trial court. *Id*. at 137-39 (lead opinion), 148 (Talmadge, J., concurring), 171 (Madsen, J., concurring).

drain at Weldon's house that, in lieu of the standard perforated pipe, consisted of drain rock next to the foundation to direct water toward a curtain drain further away from the house. Mill Creek offered a drawing the subcontractor made purporting to display the drainage system around the house. Mill Creek also offered an illustrative exhibit Schouten drew that contrasted the building plans for the footing drain with the system Mill Creek allegedly constructed. Schouten "believe[d] the system [Mill Creek] put in constitutes a footing drain" and that the system was working based on the outflow from the curtain drain pipe "and the resulting improved conditions on-site." *Id.* at 403, 405.

A building inspector for Jefferson County who approved the footing drains testified that he had not actually observed the drains, but he instead relied on the previous approval of a former inspector who did not testify at trial. He could not remember if the footing drains were ever inspected. The inspector testified that on a later visit to the property, when Weldon told the county that he did not believe that Mill Creek had installed footing drains, he observed test holes that Weldon had dug and "couldn't remember seeing the footing drains." VRP (Aug. 4, 2020) at 126. The inspector could not remember why the county had failed to follow up on the issue.

Kithcart also testified at trial. Kithcart explained that Weldon hired him to investigate a "significant water issue underneath the house," which indicated that there was either an improperly installed footing drain or no footing drain at all. VRP (Aug. 6, 2020) at 528. Kithcart excavated two different places around Weldon's house, "did not see any sign of any [footing] drain around the foundation," and observed only a poorly installed curtain drain. *Id.* Robert Christiansen, an architect Weldon hired to investigate several issues at the site, was present for the excavation and also testified that he observed no footing drains around Weldon's house.

Kithcart viewed the drawing by Mill Creek's subcontractor purporting to show the drainage system that had been built around Weldon's house. Kithcart described the drawing as "false" and explained that he had excavated in several locations where "we dug clear up to the footing and . . . there is nothing but a downspout line," which is a system "unrelated to the footing drain." VRP (Aug. 6, 2020) at 535; VRP (Aug. 3, 2020) at 89.

In rebuttal, Schouten blamed the excess water on a natural spring that he said appeared in the crawl space shortly before Weldon terminated Mill Creek.

### 2. Sill plate

Schouten also testified that he believed that the use of the 2 x 6 wall beams on top of the 2 x 4 beam for the sill plate was "code compliant." VRP (Aug. 4, 2020) at 247. He acknowledged that he unilaterally decided to use the 2 x 4 sill plate under the 2 x 6 wall without securing Weldon's approval.

Weldon testified that he confronted Schouten about the sill plate in summer 2018 and that Schouten insisted "the way that he did it was a better way, that in the corners of the framing there was an insulation improvement, and something to do with making it easier to do the plumbing." VRP (Aug. 6, 2020) at 593. Weldon never gave Schouten permission to contact the architects on his behalf.

Christiansen testified that the sill plate construction violated industry standards and the International Residential Code, which Jefferson County had adopted, because "you have to have full bearing across the sill plate surface from all of the weight that comes down from above." VRP (Aug. 4, 2020) at 159. The sill plate constructed by Mill Creek had an overhang that did not provide "full bearing" support and was a "definite safety concern." *Id.* "I have never seen this detail built

before and I would never recommend it." *Id.* Christiansen emphasized that the correction notice from the county requested "an engineer's report" that was never produced, and he described the architect's response as "cavalier." *Id.* at 161. He explained that a structural engineer would need to do the load-bearing calculations to determine if Mill Creek's construction was safe, "not another architect." *Id.* at 204.

The architect who approved the detail in response to the correction notice testified that Mill Creek requested approval of several revisions to the plans. The architect "did not have a full explanation" of how the pony wall was balanced over the sill plate when they approved Mill Creek's work. VRP (Aug. 5, 2020) at 439. "We were under the impression that . . . the 2 x 6 sill plate was there with a 2 x 4 mudsill plate underneath that," and centered as opposed to overhanging on one side. *Id.* The architect testified that, as constructed, the pony wall and sill plate were not in compliance with the building plans or the International Residential Code. *See* INTERNATIONAL RESIDENTIAL CODE § R602.3.4. The trial court questioned the architect directly, and the architect clarified that the code violation resulted from the 2-inch unsupported overhang of the pony wall plate over one side of the sill plate.

### 3. Closing arguments

In closing, Mill Creek argued that it had not materially breached the contract, even if some of its work was not precisely to specifications. Weldon began closing by responding that evidence presented at trial showed that the defective construction caused safety issues, especially with regard to structural integrity and water flowing around the foundation. Although Weldon never mentioned materiality during this argument, he was responding to Mill Creek's argument about

lack of materiality. Weldon asserted throughout that he was entitled to payment for the cost of repairs necessary to fix the defective work performed by Mill Creek.

    4.      Findings of fact, conclusions of law, and judgment

The trial court found that Weldon and Mill Creek entered into a contract to build a house pursuant to the building plans.

In its oral ruling, the trial court found Kithcart "particularly credible and knowledgeable" about the conditions at the site. VRP (Oct. 27, 2020) at 730. The trial court relied on testimony from Kithcart and other contractors that there were no footing drains installed and poor drainage on the property, resulting in water flowing under the house. The trial court considered Christiansen's testimony explaining that a footing drain should contain "perforated pipe at the footing [that] takes water out away from the house," and that Christiansen, Kithcart, and Weldon had not seen any drains matching that description. *Id.* at 728. The trial court found the testimony from Mill Creek's subcontractor that he installed modified footing drains was not credible. The trial court found Schouten's claims that Mill Creek built footing drains and that the water under Weldon's house was from a spring in the crawl space were not credible. The trial court found that Mill Creek had not installed any footing drains on the house.

The trial court found that the architect who approved Mill Creek's sill plate had not observed or understood how Mill Creek constructed the sill plate when he approved the detail. The trial court noted that the county asked for weight-bearing calculations but the architect's "response to that did not address those at all." *Id.* at 725. "But when he looked . . . and saw what was actually done, he originally was unequivocal in saying he did not believe that was compliant with plans or the code." *Id.* at 727. And Christiansen, Weldon's expert witness who was an architect, was

"amazed" that the architect would have approved that. *Id.* at 728. The trial court did not accept some of Christiansen's estimates for the cost of repairs, but otherwise did not have a problem with his credibility.

In its written findings and conclusions, the trial court found that Mill Creek agreed to build a house based on the architect's plans, "including but not limited to footing drains and proper sill plates . . . as required in the plans." CP at 134. It found that Mill Creek made representations to Weldon about the quality and price of materials used to construct his home, but that Mill Creek's work was of "significantly inferior quality to that which was represented." *Id.* It found that Mill Creek requested payments that "included charges for defective work," plus labor, equipment, and fixtures that Mill Creek never provided. *Id.* The trial court found that Mill Creek's representations about its compliance with the building plans "were false." CP at 135. The trial court found that Mill Creek breached the contract by failing to provide footing drains and "failing to construct proper sill plates under the structure's walls" as well as several other items. CP at 137. And it found that Mill Creek "knowingly and willfully overcharged Gary Weldon for work performed and charged Gary Weldon for work not performed." CP at 135. But the trial court found that Mill Creek's breach "was not material" and Weldon "had a duty of counter performance to pay for [Mill Creek's] work." CP at 138.

The trial court found that although Weldon notified Mill Creek before termination "of their failure to follow specifications and their failure to perform work in a manner that meets industry standards, Mill Creek refused to cure such defects." CP at 134. The trial court acknowledged that "one of the terms of the contract was that [Mill Creek] reserved the right to correct any defective work." VRP (Oct. 27, 2020) at 739. But, because Weldon "did not have any confidence or trust"

in Mill Creek and some of the problems were not found until after the contract was terminated, the trial court found Weldon had no obligation to let Mill Creek correct its defective work. *Id.* "It would not be possible, it would not be practical, and it would not be appropriate." *Id.*

Nevertheless, the trial court found that Weldon breached the contract by terminating. Many of the construction defects were ones that Weldon discovered after he terminated the contract with Mill Creek. The trial court found that Weldon's basis for terminating "was pretty vague and pretty general," and although Weldon's loss of trust in Mill Creek was justified based on the later-discovered defective work, "there really wasn't an adequate basis expressed *at the time* to terminate the agreement." VRP (Dec. 5, 2020) at 769-70 (emphasis added). The trial court therefore awarded Mill Creek the amount it claimed in its final billing, approximately $105,000.

The trial court then found that Weldon was entitled to damages under the contract for, among other issues, the defective sill plate and footing drains. The trial court awarded Weldon approximately $113,000 in offset damages, resulting in a net award for Weldon of just under $8,000. The trial court noted that if it "had been able to determine that Weldon was entitled to terminate the contract as he did, the result would have been a whole lot more favorable financially to Mr. Weldon." *Id.* at 771. The trial court denied Mill Creek's request to foreclose its lien because the offset damages resulted in no money judgment in Mill Creek's favor. The trial court quashed the lien.

The trial court declined to find either side had substantially prevailed for the purposes of awarding attorney fees. Because Weldon had a net judgment in his favor, the trial court awarded him statutory attorney fees of $200 and declined "to award actual attorney's fees" to Mill Creek. VRP (Oct. 27, 2020) at 744. The total judgment awarded to Weldon was $8,130.08.

Mill Creek timely appealed the findings of fact, conclusions of law, and judgment. Weldon then cross appealed the same orders.

D.     Reconsideration

Mill Creek timely moved for reconsideration of the trial court's findings regarding the footing drain and sill plate. It also asked to reopen the judgment "to allow the additional testimony of Tracy Gudgel as it relates to the sill plate issue and the footing drain." CP at 144. Mill Creek also submitted a declaration from Gudgel asserting, "I was never retained by Mr. Weldon and I did not have a verbal or written contract with him to perform any work." CP at 347.

Mill Creek argued that the conflict of interest provisions of CR 26 regarding discovery of expert testimony required "an expert to be retained by a party" in order to prohibit the expert from testifying for the other side. VRP (Feb. 26, 2021) at 18. "Mill Creek didn't disclose [Gudgel] as a CR 26 expert because we never did hire him as an expert." *Id.* at 17. Weldon countered that "it doesn't matter whether or not someone's been hired [or] whether or not there's been a retainer paid. . . . It's a question of whether or not someone has been taken under another's confidence." *Id.* at 22.

The trial court ordered the parties to participate in an evidentiary hearing with testimony from Gudgel, Kithcart, and Weldon. It explained that it would revisit its decision excluding Gudgel and that if it concluded Gudgel had been properly excluded, it would "establish the basis for that." VRP (Mar. 10, 2021) at 31.

1.     Evidentiary hearing

Kithcart and Gudgel testified at the hearing. Kithcart testified that he had been hired by Weldon and was friends with Gudgel. He informally brought Gudgel with him to investigate the

drainage issues at Weldon's house. Kithcart and Gudgel determined that "there was no drainage system" around Weldon's house and that the sill plate could "structurally work" but "wasn't what was on the plan" for the house. VRP (May 11, 2021) at 45, 47. Kithcart testified that Gudgel then provided Weldon with a construction detail for a curtain drain system that might improve the drainage situation. He also remembered Weldon asking Gudgel to provide a statement about the quality of construction, and Gudgel agreeing to "get him something together." *Id.* at 51. Because Weldon asked Gudgel for his opinion on Mill Creek's work, Kithcart believed Weldon intended to hire Gudgel.

Gudgel did not contradict any of Kithcart's testimony but explained that he had worked for Mill Creek in the past and was surprised by the issues that he saw on the visit to Weldon's house. He stated that he did not know whether any drainage system that Mill Creek installed at the house was working. Although he conceded that he produced the curtain drain detail for Weldon, he testified that he had not billed Weldon for any work. He did not remember discussing a lawsuit with Weldon. He did not remember being asked to run any calculations on the sill plate. When asked if Weldon had ever asked "for a letter or a report or something that would detail your findings or your observations," Gudgel answered, "Not that I remember," aside from the curtain drain detail. *Id.* at 76.

2. Ruling on reconsideration

The trial court denied reconsideration of its ruling excluding Gudgel because of his conflict of interest. The trial court found again that Kithcart was a credible witness. The trial court found that Weldon asked Gudgel "for some kind of statement or letter" of Gudgel's observations about the construction of Weldon's house, which Gudgel agreed to provide. *Id.* at 92. The trial court

found that the curtain drain detail that Gudgel gave Weldon corroborated testimony from Kithcart and Weldon that "there was a relationship established." *Id.* at 93. The trial court found first Gudgel was "going to be asked to likely testify on behalf of [Weldon] and of course [Gudgel] realizes that Mill Creek is the contractor and . . . somehow or another then [Gudgel] never responded to [Weldon's] follow-up and ended up apparently willing to testify for [Mill Creek]." *Id.* at 93-94. The trial court highlighted several places in Gudgel's testimony where he claimed to not recall whether he discussed a lawsuit with Weldon, or whether Weldon tried to contact him after the site visit. The trial court stated that Gudgel "basically did not contradict directly anything that [Kithcart] or Mr. Weldon has said." *Id.* at 94.

The trial court also found Gudgel's testimony that it would be relatively inexpensive to repair the defective sill plate was not credible. The trial court denied the motion for reconsideration in its entirety.

Mill Creek also appeals the order denying reconsideration.

ANALYSIS

I. EXCLUSION OF GUDGEL'S TESTIMONY

Mill Creek argues the trial court erred by excluding Gudgel as an expert witness. We disagree.

Mill Creek does not challenge the trial court's credibility determinations or argue that there was a lack of substantial evidence to support its findings that Gudgel had a conflict of interest. The trial court said expressly that it did not ultimately exclude Gudgel as a sanction for a discovery violation, but because of his conflict of interest.

CR 26(b)(1) generally allows parties to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." But, CR 26(b)(5)(B) generally prohibits discovery of "facts known or opinions held by an expert who is not expected to be called as a witness at trial." This is because a "consulting expert" is "considered part of the party's team and their opinions are treated as work product." *Stevens v. Gordon*, 118 Wn. App. 43, 50, 74 P.3d 653 (2003). Limited exceptions include "exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." CR 26(b)(5)(B). An opposing party cannot call a consulting expert to testify at trial. *Peters v. Ballard*, 58 Wn. App. 921, 926, 795 P.2d 1158 (1990).

"[O]nly opinions acquired and developed in anticipation of litigation are expert opinions; professionals who have acquired facts and opinions not in anticipation of litigation, but from some other involvement, are not expert witnesses." *Kimball v. Otis Elevator Co.*, 89 Wn. App. 169, 175-76, 947 P.2d 1275 (1997). We review a trial court's decision to admit or exclude an expert witness for abuse of discretion. *Id.* at 176. Trial courts may consider unfair surprise and timeliness in exercising their discretion. *Stevens*, 118 Wn. App. at 51.

In *Firestorm*, the Washington Supreme Court affirmed a trial court's ruling that counsel violated CR 26(b)(5) by conducting an ex parte interview with an expert who may have been employed by the opposing party. 129 Wn.2d at 139 (lead opinion). The lead opinion explained, CR 26(b)(5) "does not contemplate discovery of experts outside of its explicit requirements. Based on the plain language of the rule, we hold as a general principle ex parte contact with an opposing party's expert witness is prohibited by CR 26." *Id.* at 137 (lead opinion). The lead opinion reasoned that while it was not clear whether the expert in *Firestorm* was directly employed by one of the

parties, because he was employed by the law firm who represented the opposing party, counsel had notice of his questionable status. *Id*. at 139. "When faced with an expert employed by opposing counsel, who may or may not technically be employed by an opposing party, counsel should *always* comply with CR 26(b)(5) in proceeding with any discovery or contacting that expert." *Id*. (emphasis added). "[T]he trial court may then fashion the proper form and scope of discovery, as required by the particular circumstances." *Id*. Two concurring opinions agreed that the attorneys' conduct violated CR 26(b)(5). *Id*. at 146-48 (Talmadge, J., concurring), 156-63 (Madsen, J., concurring).

In contrast, Division Three has affirmed a trial court order admitting a doctor's deposition when the doctor had not been hired by either party in the case and had evaluated the plaintiff well before the lawsuit began. *Kimball*, 89 Wn. App. at 175-76. In that case, the doctor was not an expert witness consulted in anticipation of litigation, so it was not an abuse of discretion to admit his deposition. *Id.* at 176.

Gudgel was a civil engineer specializing in structural and drainage issues who visited Weldon's property to investigate issues with the construction and drain system. Weldon filed a declaration stating that he contacted Gudgel multiple times about providing a letter commenting on the construction of Weldon's house. Kithcart testified that Gudgel agreed to provide Weldon with a statement about the quality of work that Mill Creek had done on Weldon's house. Gudgel testified that he could not remember any discussions or agreements with Weldon, besides furnishing the detail for the curtain drain. In sum, Kithcart and Weldon believed that Gudgel agreed to work with Weldon regarding the problems with Mill Creek's construction, including providing a letter about the quality of the construction. Regardless of what Mill Creek was going to have

Gudgel testify about, Weldon insisted that he approached his relationship with Gudgel as one with an expert he intended to hire, and this was after he hired an attorney. Gudgel, on the other hand, was evasive about the interactions, except for corroborated facts such as that he provided a curtain drain detail to Weldon.

The trial court repeatedly found Kithcart's testimony particularly credible, and we do not review a trial court's credibility determinations. *Real Carriage Door Co., ex rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955, *review denied*, 198 Wn.2d 1025 (2021). In its oral ruling, the trial court found that there was a "relationship established" between Weldon and Gudgel, with Weldon relying on Gudgel's expertise as an engineer. VRP (May 11, 2021) at 93. And the trial court found that Gudgel had not contradicted any of Kithcart or Weldon's statements about the nature of Gudgel's relationship with Weldon. Further, evidence at trial indicated that Weldon anticipated legal action as he was terminating the contract. And Mill Creek had already filed the construction lien when Gudgel visited the property. Although Weldon did not expressly retain Gudgel as an expert, under these facts, it was not an abuse of discretion for the trial court to conclude that Mill Creek should have been on notice of Gudgel's questionable status and sought a CR 26(b)(5) determination of exceptional circumstances before attempting to have him testify. *Firestorm*, 129 Wn.2d at 139. It was not untenable for the trial court to bar Mill Creek from calling him at trial. We hold that the trial court did not abuse its discretion by excluding Gudgel as an expert witness.

## II. FINDINGS REGARDING DEFECTIVE WORK

A.      Findings that Footing Drains Were Not Installed and the Sill Plate Was Defective

Mill Creek argues the trial court's findings that Mill Creek had not installed footing drains and the sill plate installation was defective were not supported by substantial evidence.[3] We disagree.

We review challenged findings of fact "for substantial supporting evidence in the record." *Proctor v. Huntington*, 146 Wn. App. 836, 844, 192 P.3d 958 (2008). Substantial evidence is "a sufficient quantum of evidence in the record to persuade a reasonable person that a finding of fact is true." *Pardee v. Jolly*, 163 Wn.2d 558, 566, 182 P.3d 967 (2008). We "then consider whether the findings support the court's conclusions of law." *Proctor*, 146 Wn. App. at 845. We will not substitute our judgment for that of the trial court. *Sunnyside Valley Irr. Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003). "We will not 'disturb findings of fact supported by substantial evidence even if there is conflicting evidence.'" *Hoover v. Warner*, 189 Wn. App. 509, 520, 358 P.3d 1174 (2015) (quoting *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010)). "And we defer to the trial judge on issues of witness credibility and persuasiveness of the evidence." *Id*.

Weldon is correct that Mill Creek does not identify specific findings of fact in its assignments of error and that unchallenged findings of fact are verities on appeal. *Real Carriage Door*, 17 Wn. App. 2d at 457. But a technical violation of the rules will not bar our review "'where

---

[3] Mill Creek also disputes "an implicit finding about the cost to address this perceived defect." Appellant's Br. at 37. There is no assignment of error for this issue. Mill Creek's assignments of error do include an assertion that the "trial court erred in concluding that the pony wall / sill plate, if defectively installed, could not be repaired." *Id.* at 3. It does not argue this assignment of error in the body of its brief, and no such conclusion appears in the trial court's findings of fact and conclusions of law.

the nature of the challenge is perfectly clear, and the challenged finding is set forth in the appellate brief.'" *State v. Olson*, 126 Wn.2d 315, 322, 893 P.2d 629 (1995) (quoting *Daughtry v. Jet Aeration Co.*, 91 Wn.2d 704, 710, 592 P.2d 631 (1979)). Mill Creek discusses several relevant findings in its brief, and it is clear that Mill Creek wants this court to conclude that the trial court's findings about the footing drains and sill plate are not supported by substantial evidence. Thus, we exercise our discretion to reach the merits of Mill Creek's argument.

The trial court found that Mill Creek had not installed footing drains as shown in the plans incorporated into the contract between the parties. And the trial court found that the sill plates Mill Creek installed did not comply with the plans or with the International Residential Code § R602.3.4. The trial court found Kithcart credible. The trial court found that some of Christiansen's estimates for the cost of repairs were not credible but otherwise did not doubt his credibility. Both witnesses testified that Mill Creek had not installed footing drains, based on personal observations of holes Kithcart excavated looking for the drains. Additionally, the trial court found that testimony and exhibits from Mill Creek's witnesses, including Schouten's claims that they had built footing drains, were not credible.

Similarly, both Christiansen and the architect who drew up the plans testified that having the pony wall overhang the sill plate by two inches violated the International Residential Code. And the architect clarified that he initially approved the detail because he did not know that Mill Creek built the wall with an overhang. Mill Creek's only evidence to the contrary was testimony from Schouten, the president of Mill Creek, who was not an architect, that he believed the sill plate was "code compliant." VRP (Aug. 4, 2020) at 247. Schouten also acknowledged that he deviated from the plans for the sill plate without securing Weldon's approval. And the trial court found

21

several of Schouten's statements defending Mill Creek's actions or claiming that Weldon approved changes were not credible.

We will not overrule a trial court's findings of fact merely because there is conflicting evidence, and we defer to the trial court's credibility determinations. *Hoover*, 189 Wn. App. at 520. Multiple witnesses testified that there were no footing drains, and even Mill Creek's description of the footing drains it claims to have installed did not comply with the plans. Several expert witnesses testified that the sill plate did not meet code requirements, and Schouten admitted that the sill plate also did not comply with the plans. And the trial court found that Gudgel's testimony on reconsideration about the ease of repairing the sill plate was not credible.

We hold that substantial evidence supported the trial court's findings that Mill Creek failed to install footing drains and defectively installed the sill plate. These findings supported the conclusion that Mill Creek breached the contract.

B.     Materiality of Mill Creek's Breach

Weldon argues the trial court erred by ruling that Mill Creek did not materially breach the contract. Weldon asserts that he may challenge the "legally erroneous ruling" regarding materiality on appeal under RAP 2.5(a)(2). Br. of Resp't/Cross-Appellant at 49. Mill Creek responds that Weldon invited any error by failing to discuss the materiality of Mill Creek's breaches before the trial court and by drafting proposed findings of fact and conclusions of law that included the materiality finding. We conclude that Weldon did not invite error or waive this issue below, and we remand for the trial court to apply the proper legal test for determining whether Mill Creek materially breached the contract.

1.      Invited error

As a preliminary matter, in its oral ruling, the trial court stated that Weldon was not "entitled to terminate the contract as he did," which implies that Mill Creek did not materially breach the contract because given the lack of specific preconditions to termination, Weldon otherwise would have been entitled to terminate. VRP (Dec. 5, 2020) at 771. A losing party "does not waive error by cooperating when a trial court asks that its lawyer provide draft findings and conclusions that reflect the court's announced decision." *Gamboa v. Clark*, 180 Wn. App. 256, 266, 321 P.3d 1236 (2014). Weldon did not invite the alleged error by tracking the trial court's oral ruling when he drafted the findings and conclusions.

2.      Waiver

Weldon primarily argued at trial that there was no binding contract. But in closing, he did rely on evidence presented at trial to rebut Mill Creek's argument that its departure from the building plans was not material.

RAP 2.5(a) gives appellate courts discretion to accept or deny review of "any claim of error which was not raised in the trial court." Under CR 15(b), "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." A failure to amend the pleadings does not affect the merits of an issue if trial by express or implied consent of the parties has occurred. *See* CR 15(b).

Here, although Weldon did not assert Mill Creek materially breached the contract as an affirmative defense in his answer, both parties presented evidence at trial about the extent of Mill Creek's alleged defective construction. Mill Creek raised lack of materiality in its closing and fully argued the issue based on the evidence presented at trial as a reason why Weldon was not entitled

to terminate the contract. Weldon began his closing by responding to this argument, relying on his own evidence. Thus, it appears both parties tried the issue by implied consent under CR 15(b). And to the extent necessary, we exercise our discretion to reach this issue under RAP 2.5(a).

      3.      <u>Materiality</u>

Material breach is an affirmative defense to a breach of contract claim. *Wlasiuk v. Whirlpool Corp.*, 81 Wn. App. 163, 179, 914 P.2d 102 (1996). If a breach of contract is material, "'it follows that substantial performance has not been rendered, and further performance by the other party is excused.'" *U.S. Bank Nat'l Ass'n v. Roosild*, 17 Wn. App. 2d 589, 602-03, 487 P.3d 212 (quoting *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 179 Wn. App. 205, 220, 317 P.3d 543 (2014)), *review denied*, 198 Wn.2d 1026 (2021). Whether a breach of contract is material is a question of fact. *TMT Bear Creek Shopping Ctr., Inc. v. Petco Animal Supplies, Inc.*, 140 Wn. App. 191, 209, 165 P.3d 1271 (2007). Washington courts have used *Restatement (Second) of Contracts* § 241 (Am. L. Inst. 1981), to determine when a breach of contract is material, meaning it is significant enough to warrant self-help through termination of the contract:

> [I]n determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>     (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>     (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>     (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>     (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>     (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*DC Farms*, 179 Wn. App. at 221 (quoting RESTATEMENT § 241) (alteration in original).

Here, the trial court found that Mill Creek's work "did not conform to the terms of the Contract and . . . failed to meet industry standards." CP at 134. In spite of notice from Weldon, "Mill Creek refused to cure such defects." *Id.* Further, "Mill Creek's requests for payment, over the course of the project, included labor, equipment and fixtures not provided by Mill Creek and included charges for defective work that was performed." *Id.* And Mill Creek's construction and materials were "of a significantly inferior quality to that which was represented." *Id.* The trial court found that Schouten's representations regarding compliance with agreed-upon specifications "were false." CP at 135.

The trial court also found that Mill Creek represented to Weldon that its invoices "accurately reflected the amount due for materials and work actually performed to date under Mill Creek's proposal." *Id.* These representations were false. "Mill Creek and Schouten knowingly and willfully overcharged Gary Weldon for work performed and charged Gary Weldon for work not performed." *Id.* Mill Creek did not "fully and adequately perform[] the work for which they charged Mr. Weldon. Mill Creek received compensation for work not performed or performed in a substandard manner to the detriment of Mr. Weldon." *Id.*

Finally, the trial court found that the defective sill plate "causes safety issues . . . and potential catastrophic damage of the wall during a seismic or lateral movement incident," amounting to a "construction violation" of the county and International Residential Code. CP at 136. "The violation has not been resolved and remains as a potential safety hazard." CP at 137.

As a result, the trial court concluded that Mill Creek breached the contract by failing to provide "1) footing drains; 2) failing to construct proper sill plates under the structure's walls; 3) failing to provide proper door casings; 4) fail[ing] to construct door casings properly; 5) fail[ing]

to provide a proper septic system; and 6) fail[ing] to construct the deck properly." *Id.* Moreover, the trial court's written findings are devoid of mitigating facts. But the trial court also concluded, "The breach was not material and [Weldon] had a duty of counter performance to pay for [Mill Creek's] work." CP at 138.

Despite reciting factual findings related to the breach of the contract, the trial court did not analyze the *Restatement* § 241 factors. Because nothing in the record suggests that the trial court actually applied the necessary *Restatement* § 241 factors for evaluating materiality, we reverse the trial court's conclusion that Mill Creek's breach was not material, and we remand for the trial court to apply the *Restatement* § 241 factors to the facts it has already found, the credibility determinations already made, and the evidence already presented at trial.

4.     Right to repair

Mill Creek also argues the trial court erred by giving no effect to the right to repair clause in the contract and allowing Weldon to recover damages for Mill Creek's defective work. Mill Creek argues that it was entitled to notice and the opportunity to cure any defective work before termination and that Weldon's failure to comply with that provision barred him from recovering offset damages. But the trial court found that Weldon notified Mill Creek "of their failure to follow specifications and their failure to perform work in a manner that meets industry standards" and that "Mill Creek refused to cure such defects" before termination. CP at 134. Mill Creek does not challenge this finding of fact on appeal. Thus, the finding that Mill Creek refused to cure its defective work that Weldon discovered before terminating is a verity. This includes Mill Creek's failure to correct the defective sill plate. Based on the unchallenged finding and our remand for

further analysis of whether Mill Creek materially breached the contract under the *Restatement* § 241 factors, we need not address this issue further at this stage.

### III. DENIAL OF FORECLOSURE

Mill Creek argues the trial court erred by not foreclosing its lien. The trial court found that Mill Creek owed Weldon roughly $8,000 more in offsets than it was entitled to in damages. Thus, Mill Creek was in fact the judgment debtor. Mill Creek's status as judgment debtor will not change on remand. Thus, the trial court did not err by denying foreclosure of the lien.

### IV. ATTORNEY FEES

Mill Creek argues that the trial court erred in ruling that Mill Creek did not substantially prevail and in denying Mill Creek attorney fees. Additionally, Mill Creek seeks attorney fees on appeal under RAP 18.1 and the lien statute, RCW 60.04.181(3). Weldon seeks attorney fees on appeal under the contract signed by the parties, RAP 18.1, and RCW 4.84.330.

In general, the prevailing party is the one who receives a judgment in their favor. *Emerick v. Cardiac Study Ctr., Inc., P.S.*, 189 Wn. App. 711, 732, 357 P.3d 696 (2015). If neither party wholly prevails, then we consider if one party substantially prevailed. *Id*. "Whether a party is a prevailing party is a mixed question of law and fact that this court reviews under an error of law standard." *Id*.

Here, the trial court concluded neither party substantially prevailed, but it granted Weldon statutory fees under chapter 4.84 RCW. It was not error for the trial court to, at the very least, award Weldon offset damages, so Mill Creek did not substantially prevail.

Whether Weldon substantially prevailed depends on the trial court's resolution of the question of material breach on remand. The trial court should revisit attorney fees for Weldon after it decides the material breach issue because Weldon may become the prevailing party.

With regard to attorney fees on appeal, RAP 18.1(a) authorizes the award of appellate attorney fees if "applicable law" permits. Mill Creek relied upon RCW 60.04.181(3), which provides that a court may award the prevailing party in a lien action reasonable costs, including "necessary expenses incurred by the attorney in the superior court, court of appeals, supreme court, or arbitration." Weldon relies upon RCW 4.84.330, which provides that in a contract action, where provided by the contract, courts should award reasonable fees and costs to the prevailing party, which "means the party in whose favor final judgment is rendered." The contract between the parties in this case provides that claims or disputes "relating to the contract, or the breach thereof . . . shall be subject to legal fees." CP at 52.

We do not award Mill Creek attorney fees on appeal because it does not substantially prevail. With regard to Weldon's request, he will be entitled to appellate attorney fees under RCW 4.84.340 if the trial court finds that Weldon is a substantially prevailing party on remand.

CONCLUSION

We reverse the trial court's conclusion that Mill Creek's breach of the contract was not material. We remand for the trial court to apply the materiality factors to the facts it has already found, the credibility determinations it has already made, and the evidence presented at trial. The trial court should then reevaluate whether Weldon substantially prevails and is entitled to full attorney fees. If the trial court determines that Weldon is a substantially prevailing party after

remand, then he shall be entitled to his appellate attorney fees. We conclude that the trial court did not err when it declined to award Mill Creek attorney fees below. We otherwise affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J

We concur:

Lee, J.

Price, J.

29