# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| TONYA A. ELLIOTT and WILLIAM JOSEPH, husband and wife, and JAMES F. ELLIOTT, an individual,<br><br>                  Appellants,<br><br>   v.<br><br>NOEMI CAGATIN-PORTER and PIERRE L. PORTER, JR., husband and wife,<br><br>                  Respondents. | No. 57454-3-II<br><br><br>UNPUBLISHED OPINION |

MAXA, P.J. – Tonya Elliott and William Joseph, husband and wife, and James Elliott (collectively, "the Elliotts") appeal the trial court's judgment after a bench trial in a suit against their neighbors, Noemi Cagatin-Porter and Pierre Lamont Porter, Jr. (collectively, "the Porters"), ruling in favor of the Porters on their counterclaim for nuisance, issuing a permanent injunction against the Elliotts, and awarding the Porters attorney fees and sanctions for violating a temporary restraining order (TRO).

The Elliotts reside at the 6411 Property, located in Tacoma. They own two other properties in Tacoma in the Elliott Family Trust: the 5310 Property and the 5305 Property. The Porters live at the 5306 Property, which is adjacent to the 5310 Property and across the alley from the 5305 Property.

When the Porters purchased the 5306 Property, they hired contractors to remodel the interior of the house and to do landscaping in the yard. The Porters moved into the home at some point after the remodel.

After the Porters moved into the 5306 Property, the Elliotts alleged that the Porters'
contractor had damaged portions of a cedar fence that runs between the 5306 and 5310
Properties and had damaged other portions of their property.

The Elliotts later filed a lawsuit against the Porters, alleging among other claims waste,
trespass, nuisance, and harassment. The Porters asserted counterclaims, including nuisance and
harassment, against the Elliotts. A trial court judge granted the mutual TRO for the duration of
the lawsuit.

After a bench trial, the trial court dismissed all of the Elliotts' claims against the Porters
and ruled in favor of the Porters on their counterclaim for nuisance. The trial court also entered a
permanent injunction against the Elliotts prohibiting them from taking photos of the Porters,
conducting surveillance of the Porters, glaring or staring at the Porters, interfering with the
Porters' use of the 5306 Property, and making excessive noise directed at the Porters, among
other things. Finally, the trial court ruled that the Elliotts committed several violations of the
mutual TRO and ordered the Elliotts pay the Porters $15,000 in sanctions.

We hold that the trial court did not err when it (1) ruled in favor of the Porters on their
counterclaim for nuisance; and (2) issued the permanent injunction against the Elliotts because it
(a) does not violate CR 65(d) and is not unconstitutionally vague because it sets forth the specific
persons and acts sought to be restrained, (b) does not violate the Elliotts' constitutional right to
privacy because they do not have a right to surveil the Porters from their properties; and (c)
lawfully imposed fines of $2,500 or an amount determined by the trial court per violation of the
injunction. We do not address the Elliotts' argument that the trial court erred in ordering them to
pay $15,000 in sanctions because they provide no meaningful argument on this issue.

Accordingly, we affirm the trial court's judgment and injunction order.

FACTS

*Background*

The Elliotts reside at the 6411 Property, which is located in Tacoma. They also own other properties in Tacoma, which are held in the Elliott Family Trust: the 5310 Property and the 5305 Property.

The Porters live at the 5306 Property, which is also located in Tacoma. The 5306 Property is adjacent to the 5310 Property, and is located directly across the alley from the 5305 Property.

The Porters purchased the 5306 Property in May 2019. After purchasing the property, the Porters hired a contractor to perform remodeling work, including a kitchen and bathroom remodel. During the remodel, the Porters did not live at the 5306 Property.

The Porters' contractor performed work on the yard of the 5306 Property during the latter part of 2019 and early 2020. At one point, the contractor placed a load of gravel next to a cedar fence located between the 5306 Property and the 5310 Property. The contractor moved the gravel away from the fence the following day.

In June 2021, William[1] told Lamont that he believed one of the Porters' contractors broke a board at the base of a section of the cedar fence. William showed Lamont the relevant portion of the fence. Lamont did not know how the contractors could have broken the board, but he nonetheless offered to have his contractor repair the fence after they completed landscaping.

On July 6, 2021, the Porters received a letter from Tonya and William alleging that the Porters' contractor had damaged a large section of the cedar fence between the 5306 and 5310

---

[1] To avoid confusion, the Elliotts and Porters will be referred to individually by their first names. No disrespect is intended.

properties, a chain-link fence on the 5305 Property across the alley, and a retaining wall on the front of the 5310 property. The letter stated that the Elliotts would bill the Porters for the entire cost of the repairs.

After receiving the letter, the Porters inspected the cedar fence, chain-link fence, and retaining wall for damage. The only damage they saw to any of the property was one damaged board at the base of a small section of the cedar fence. The Porters did not know who damaged the board.

On July 13, the Porters' attorney sent a letter to William and Tonya disputing their claims of damage to the fences and the retaining wall. The letter acknowledged that one of boards on the cedar fence was damaged and stated that the Porters were willing to repair that portion of the fence.

The Porters' attorney subsequently received a demand letter from the Elliotts' attorney alleging that the Porters had committed trespass, waste, and harassment. The Porters' attorney responded to the Elliotts' letter and denied the allegations about the Porters causing damage to the fences and retaining wall.

*Elliotts' Claims and Porters' Counterclaims*

In September 2021, the Elliotts filed a complaint against the Porters, asserting claims of waste and trespass, common law trespass, nuisance in violation of RCW 7.48, common law nuisance, harassment, and negligence and seeking injunctive relief.

The Elliotts made a number of factual allegations in their complaint, including that the Porters (1) used a sump pump to remove water from their basement and drained it toward the 5310 Property, flooding its basement; (2) left large amounts of trash in trash receptacles in the alley such that it blocked vehicles from traveling through the driveway; (3) damaged the Elliotts'

chain link fence, cedar fence, and retaining wall during their home remodel; and (4) engaged in a campaign of harassment against the Elliotts after they received the July 6 letter, which included parking in such a way as to block the Elliotts into their driveways, attempting to confront the Elliotts when they left their homes, trespassing onto the 5310 Property, and throwing trash and debris into the Elliotts' vehicles.

That same day, the Elliotts filed a motion for a TRO against the Porters. Tonya, James, and William each signed declarations under oath and penalty of perjury in support of their motion for a TRO. The trial court issued an order granting the Elliotts' motion for a TRO. The TRO restrained both the Elliotts and Porters for the duration of the lawsuit from:

> [E]ntering onto another Party's properties, trespassing on another Party's properties, surveilling another party (except that a party may use a body camera so long as such use is not for surveillance), preventing either Party from movement, contacting either Party in any way or approaching within five hundred (500) feet of either Party (other than to access their own properties), or having any agent do any of the foregoing.

Clerk's Papers (CP) at 29-30.

The Porters filed an answer to the complaint and asserted counterclaims for harassment, negligent infliction of emotional distress, defamation, common law and statutory nuisance in violation of RCW 7.48, and requested an injunction.

*Bench Trial*

The trial court conducted a bench trial. The Elliotts and the Porters testified, and the Porters called eight witnesses. The court dismissed all of the Elliotts' claims and ruled in favor of the Porters on their nuisance counterclaim. The trial court entered detailed findings of fact and conclusions of law supporting its ruling.

With regard to the Porters' counterclaim for nuisance, the court made the following findings of fact:

36. Shortly after the [Porters] received the July 6, 2021 letter from Ms. Elliott, the [Elliotts] engaged in increasingly hostile and bizarre behavior directed toward the [Porters]. For example, the [Elliotts] began surveilling the [Porters'] home. Plaintiff James Elliott would sit in a truck facing the [Porters'] home, stare at the [Porters'] Property and watch the [Porters] and their family and guests for hours, sometimes with the use of binoculars. A neighbor, Patsy Stahl, witnessed James Elliott lying beside his truck while surveilling the [Porters'] activities.

37. James Elliott's surveillance of the [Porters] was also witnessed by [the Porters'] trial witnesses Robert Burrell, Paul Cagatin, and Sharon Burrell. The aforementioned witnesses also testified that the [Elliotts] would surveil the [Porters] while on their property by gathering next to the Cedar Fence, and [Elliotts] would further use their pressure washer right next to the Cedar Fence resulting in spraying water onto the [Porters'] property in the exact area where [Porters'] family gatherings were occurring.

38. The [Elliotts] engaged in making purposeful noisemaking while the [Porters] were in their backyard, including banging a gong to be disruptive and annoy the [Porters].

39. The [Elliotts] allowed and encouraged their dogs to bark at the [Porters]. The court is unpersua[ded] that James Elliott telling his dogs "good boy" when barking at the [Porters] is a thanking the dogs for "alerting him."

40. James Elliott placed a Handicap sign in the middle of the street while sitting in a chair next to it to prevent others from parking in the street. The Court is unpersuaded that he did so and sat in the street so his daughter could clean the surrounding area of debris. The court finds that James Elliott's actions were to keep his other eligible neighbors or visitors with disability placards from parking on the street in front of his 5310 property.
. . . .

42. Tonya Elliott contacted multiple neighbors regarding Noemi and Lamont's alleged harassment and her negative opinion of them in general, and each neighbor was shocked to hear about Tonya Elliott's allegations as each neighbor had nothing but positive interactions with Noemi and Lamont.

CP at 1817-18.

44. After the issuance of the mutual [TRO] issued in this case, [the Elliotts] continue[d] to engage in actions prohibited by the (TRO). The Court finds that in violation of the (TRO), the [Elliotts] have engaged in the following actions: 1. Regularly engage in surveillance of the [Porters], their parents and guests. 2. Congregate near the Cedar Fence at the 5310 Property and listen to conversations of [the Porters] and their guests. 3. Tonya sat in her car at the 5310 Property facing the [Porters'] Property and pointed her cell phone camera at the [Porters'] Property

as if she is taking pictures and videos of the [Porters]. 4. Defendant William Joseph stood in the upstairs window of the 5310 Property at night with the lights on and stared at the [Porters'] home while appearing to peer into the [Porters'] windows. 5. James Elliott's frequent and lengthy sitting on an elevated porch on the back of the 5305 Property high enough to peer into the [Porters'] windows and surveil activities of the [Porters] and their guests. The Court finds that the pictures and testimonies submitted by the [Porters] and their witnesses provides evidence of many of the above incidences. The Court finds that the pictures and testimonies do not constitute a violation of the (TRO) and does not constitute surveillance of the [Elliotts]. The Court finds that the pictures and testimonies provide evidence of prohibited surveillance on behalf of the [Elliotts].

CP at 1818-19.

45. The [Elliotts] took many photographs of license plates of vehicles belonging to contractors, guests, and family members of [the Porters]. The [Elliotts] used and directed a drone to take pictures and conduct surveillance of the [Porters'] property. The court finds unpersuasive Tonya Elliott's testimony that the use of the drone was to capture evidence of damage to the Cedar Fence. The above actions of the [Elliotts] are unwarranted.

. . . .

47. Patricia Stahl . . . testified that . . . she has observed James . . . lying beside his pickup truck across the alleyway seemingly watching the [Porters] while at their property.

48. In response to the [Elliotts'] increasing aggressive and bizarre behavior, the [Porters] installed security cameras at their 5306 Property. Shortly thereafter, the [Elliotts] notified the [Porters] through their counsel that they believed the [Porters'] security cameras were pointed at the [Elliotts'] Properties. The [Porters] responded to the [Elliotts'] concerns by sending pictures of the security camera's view which demonstrated that the cameras were not pointed directly at the [Elliotts'] Property. Shortly thereafter, the [Elliotts] installed a video surveillance camera above the upper top floor window on the alley side of the 5305 property. The height of the camera was high enough to allow them to point their camera directly into the [Porters'] residence. The court finds unpersuasive that it was installed for the security of Mr. Elliott to travel back and forth at night between the 5305 and 5310 properties as there was no testimony that Mr. Elliott ever walked between the 2 properties at night. The Court finds persuasive that the [Elliotts] installed their security camera to annoy and harass the [Porters] and to view inside their property. [The Porters] now keep all blinds down in their home because of the positioning of [the Elliotts'] security cameras.

CP at 1819-21.

7

52. On or about August 27, 2021, [the Elliotts] signed Declarations under oath and under penalty of perjury in support of their TRO motion which contain knowingly false statements.

CP at 1821.

The court entered the following conclusions of law related to the Porters' counterclaim for nuisance:

In this case, the evidence shows the [Elliotts'] continuing behavior of surveilling [the Porters'] conversations, drone surveillance, taking pictures of the license plates, Noemi, visitors, or others at the [Porters'] residence, placing a Handicap sign in the street and sitting in a chair next to the handicap sign to prevent [the Porters] from parking on the street, providing false accounts of the activities of [the Porters] to others including allegations that they had broken into the 5305 Property and caused damage to the 5305 and 5310 properties, pointing their video cameras at the [Porters'] property, and encouraging their dogs to bark at the [Porters]. The Court finds that such behavior by the [Elliotts] is injurious to the [Porters] and whose persona [sic] enjoyment of their property is diminished by the [Elliotts'] conduct.

The Court finds that [the Elliotts'] conduct and actions outlined above constitutes a Nuisance under RCW 7.48.20 and therefore concludes that [the Elliotts] have committed acts of Nuisance against the [Porters].

CP at 1826.

The trial court awarded $10,000 in attorney fees and costs to the Porters based on a finding that the Elliotts submitted declarations with knowingly false statements in order to obtain the mutual TRO. The trial court also imposed sanctions of $15,000 payable to the Porters against the Elliotts for repeatedly and intentionally violating the mutual TRO while it was in effect.

The trial court entered a final judgment dismissing the Elliotts' claims, finding that the Elliotts engaged in acts of nuisance against the Porters, imposed sanctions of $10,000 for the Elliotts' false statements in their TRO declarations, imposed sanctions of $15,000 for the Elliotts' violations of the TRO, and stated that the Elliotts would be subject to a permanent injunction prohibiting certain activities.

*Permanent Injunction Against Elliotts*

At the same time it entered the final judgment, the trial court entered a permanent injunction order against the Elliotts under the authority of CR 65(b) and RCW 7.40.020. The court concluded that the Porters satisfied the legal requirements for a permanent injunction because they "(1) the [Porters] have a clear legal or equitable right, (2) the [Porters] have established a well-grounded fear of immediate invasion of that right, and (3) the acts of the [Elliotts] have resulted in, or will result in, actual and substantial injury to [them]." CP at 1834.

The trial court also found that "acts of the [Elliotts] below, among other actions, has [sic] and continue to cause an invasion of the [Porters'] right to the quiet enjoyment of their property and to feel safe and secure in their home." CP at 1835.

The trial court cited to the following findings of fact and conclusions of law from the bench trial in its permanent injunction order:

1. The actions of the [Elliotts] in knowingly filing false statements under oath in this case (See FOF & COL #52 through 56).

2. [The Elliotts'] purposeful noise-making to be disruptive including banging a gong while the [Porters] are in their backyard (See FOF & COL #38).

3. [The Elliotts'] placement of a handicap sign in the middle of the street while sitting in a chair to keep others from parking on the street (See FOF & COL #40).

4. After the issuance of the mutual [TRO] issued in this case on September 21, 2021, Plaintiffs James Elliott, Tonya Elliott, and William Joseph continued to purposefully engage in actions they knew or should know are prohibited by the TRO including the following actions: 1. Regularly engage in surveillance of the [Porters], their family members, and contractors. 2. Congregate near the Cedar Fence at the 5310 Property and listen to the [Porters'] conversation while the [Porters] are in their backyard and purposefully disrupt the [Porters'] family gatherings. 3. Tonya Elliott has sat in her car at the 5305 Property facing the [Porters'] Property and points her cell phone camera at the [Porters'] Property as if she is taking pictures and videos of the [Porters]. 4. Defendant William Joseph stands in front of the upstairs window of the 5305 Property at night with the lights on and stares at the [Porters] and their home while appearing to peer into the [Porters'] windows. 5. James Elliott sits on a porch which allows him to sit high

enough on the 5305 Property to peer into the [Porters'] windows. 6. Mr. Elliott often sits on the porch of the 5305 Property and peers into the [Porters'] backyard to surveil the activities of the [Porters] (See FOF & COL #44).

5. The [Elliotts] allow and encourage their dogs to bark at the [Porters] (See FOF & COL #39).

6. The [Elliotts] took many photographs of license plates of vehicles belonging to contractors, guests, and family members of the [Porters]. The [Elliotts] have used and directed a drone to take pictures and conduct surveillance of the [Porters'] property (See FOF & COL #45).

7. The [Elliotts] installed their security cameras to annoy and harass the [Porters] and to view inside their property. [The Porters] now keep all blinds down in their home because of the positioning of [the Elliotts'] security cameras (See FOF & COL #48).

8. Tonya Elliott contacted multiple neighbors regarding Noemi and Lamont's alleged harassment and her negative opinion of them in general, and each neighbor was shocked to hear about Tonya Elliott's allegations as each neighbor had nothing but positive interactions with Noemi and Lamont (See FOF & COL #42).

CP at 1835-36.

The trial court ruled that the Elliotts' actions had resulted or would result in actual and substantial injury to the Porters. Specifically, the court ruled that the Elliotts' behavior "intentionally deprived the [Porters] of their ability to feel safe in their home, to be free of continuous surveillance, to have family gatherings without purposeful interruption by the [Elliotts], and to the right of quiet enjoyment of their property." CP at 1837.

Next, the trial court ruled that if the Elliotts were not restrained by an injunction, the Porters would continue to be deprived of their rights, and would be substantially harmed.

Finally, the trial court ruled that the Elliotts would not suffer any harm if restrained under the order because the court already had determined that the Elliotts' actions amounted to nuisance, and that there was no legitimate purpose to allow the Elliotts to continue to engage in unlawful conduct towards the Porters.

The permanent injunction restrained and enjoined:

[The Elliotts and their] agents, associates, employees, attorneys, and upon those persons in active concert or participation with them who receive actual notice of this Injunction Order or are mutually restrained, enjoined and prohibited from the following actions directed at the[Porters], their family members, contractors, guest [sic], or invitees while at or upon the[Porters' 5306 Property] . . . or at other locations where a violation of this Order may occur[.]

CP at 1838.

The permanent injunction included the following orders:

1.  The [Elliotts] shall not take pictures, record videos, or otherwise capture still or video images of the [Porters], their family members, or their guests;

2.  The [Elliotts] shall not use a drone to monitor or take pictures of the [Porters], their family members, or their guests;

4.  The [Elliotts] shall not interfere in any way with the [Porters] or the use of their 5306 Property;

5.  The [Elliotts] shall not enter onto the 5306 Property;

6.  The [Elliotts] shall not conduct surveillance of the [Porters], including but not limited to focusing [on the Porters], glaring, staring, or using binoculars to view the [Porters'] 5306 Property, or following the [Porters];

7.  The [Elliotts] shall not make excessive noise directed at the [Porters];

8.  The [Elliotts] shall not contact or communicate with the [Porters];

9.  The [Elliotts] shall not publish, by statements or otherwise, knowingly false information about the [Porters] to third persons;

10.  The [Elliotts] shall not encourage their dogs to bark at or threaten the [Porters];

11.  The [Elliotts] shall not restrict the use of the 5300 block . . . with signage or objects or sit in a chair in the 5300 block . . . The [Elliotts] shall be permitted to lawfully park [on the 5300 block].

12.  The [Elliotts] shall not point or position a camera, cell phone, or any recording device to record audio, video, or still images of the [Porters] or their 5306 Property;

13.  The [Elliotts] shall not point or aim outside lights so that they purposefully illuminate the [Porters'] 5306 Property;

11

CP at 1838-39.

The trial court stated that the order "shall remain in effect permanently or until further Order of this Court." CP at 1839.

Finally, the trial court set forth a fine of "$2,500 *or such other sum as the Court deems proper*" for each violation of the injunction by the Elliotts, payable to the Porters. CP at 1839 (emphasis added).

The Elliotts appeal the trial court's ruling in favor of the Porters on their counterclaim for nuisance, permanent injunction order, and imposition of sanctions against the Elliotts for violating the TRO.

## ANALYSIS

A. STANDARD OF REVIEW

We review a trial court's decision after a bench trial to determine whether the findings of fact are supported by substantial evidence and whether the conclusions of law are supported by the findings of fact. *Real Carriage Door Co. ex rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). Evidence is substantial if it is sufficient to convince a rational, fair-minded person that a premise is true. *Id.* We view all evidence and reasonable inferences in the light most favorable to the prevailing party. *Id.* Unchallenged findings of fact are treated as verities on appeal. *Id.* We give deference to the trial court's determinations of the credibility and weight of the evidence. *Young v. Toyota Motor Sales, U.S.A.*, 9 Wn. App. 2d 26, 32, 442 P.3d 5 (2019).

When conclusions of law are mischaracterized as findings of fact, we analyze them as conclusions of law. *Real Carriage Door*, 17 Wn. App. 2d at 457. The trial court's application of facts to law and the conclusions of law are reviewed de novo. *Id*.

B.      CHALLENGED FINDINGS OF FACT

The Elliotts assign error to several of the trial court's findings of fact and reference several findings of fact in their statement of the case. We conclude that the three challenged findings of fact for which the Elliotts provide argument are either irrelevant to this appeal or are supported by substantial evidence. And we decline to consider other findings of fact to which the Elliotts assign error because they provide no meaningful argument regarding those findings of fact.

1.      Failure to Provide Argument

The Porters argue that we should not consider the Elliotts' challenges to findings of fact because they failed to provide argument and citation to authority in support of their challenges. We agree with the exception of three findings of fact for which they present argument.

We generally decline to consider an issue when the appellant has failed to provide meaningful argument. *Wiklem v. City of Camas*, ___ Wn. App. 2d ___, 551 P.3d 1067, 1078 [¶54] (2024). Here, the Elliotts' brief contains only one short section addressing the trial court's findings of fact regarding the court's nuisance finding. And that section only references findings of fact 7, 8, and 36. Because the Elliotts present no argument regarding any of the other findings of fact, we decline to consider any challenges to those findings and treat them as verities.

2.      Findings of Fact 7-8

Finding of fact 7 states,

> No survey was obtained by the [Porters] upon acquiring the 5306 Property. The [Porters] believed that the Cedar Fence between the 5306 and 5310 Property established the common boundary line between the two Properties and that the Cedar Fence was jointly owned by the 5310 Property and the 5306 Property (hereinafter "Cedar Fence"). The [Elliotts] have not obtained a survey of the 5310 Property and have not provided evidence of the 5310 Property's boundary lines. The [Elliotts'] testimony concerning the location of the Cedar Fence with relation to the legal boundary line is ambiguous. Without a survey, the Court is unable to

13

ascertain whether the Cedar Fence is located on the legally designated boundary line or at some other location. The Court finds that prior to this lawsuit, the Cedar Fence was treated by the parties as a boundary fence with each party's property contained within the confines of the Cedar Fence. The Court finds that prior to this lawsuit, the [Elliotts] never informed the [Porters] of where they believed the boundary line was located, where the Cedar Fence was located relative to their understanding of where the boundary line is located, or that the [Porter's] landscaping, placement of a post for their gate or attachment of their fence to the Cedar Fence was considered a trespass by the [Elliotts].

CP at 1851-52.

Finding of fact 8 states,

Allegations in this case by the [Elliotts] that the [Porters] knowingly engaged in trespass because they were landscaping, attached a post or fencing section to the Cedar Fence or otherwise taking care of what was believed to be their property within the confines of the Cedar Fence are without merit.

CP at 1852.

Neither of these findings have any relevance to the Elliotts' appeal of the trial court's nuisance ruling. Therefore, even if the trial court erred in making these findings, any error was harmless.

3. Finding of Fact 36

Finding of fact 36 states,

Shortly after the [Porters] received the July 6, 2021 letter from [Tonya], the [Elliotts] engaged in increasingly hostile and bizarre behavior directed toward the [Porters]. For example, the [Elliotts] began surveilling the [Porters'] home. [James] would sit in a truck facing the [Porters'] home, stare at the [Porters'] Property and watch the [Porters] and their family and guests for hours, sometimes with the use of binoculars. A neighbor, Patsy Stahl, witnessed James . . . lying beside his truck while surveilling the [Porters'] activities.

CP at 1861.

Several people testified about the Elliotts' surveillance of the Porters' property. Tonya testified that she took photos of license plates of cars that were visiting the Porters' property.

14

And James testified that he sat in his truck for a couple of hours watching the Porters eat lunch. He also testified that occasionally he sat in his truck with a pair of binoculars.

The Porters submitted as evidence photos of James sitting on the raised patio of the 5310 Property and staring at the Porters during their family gatherings in their backyard. Robert Burrell testified that he saw James taking photographs or videos of the Porters from his porch during a family gathering at the Porters' home. Sharon Burrell also testified that she saw James sitting on his back porch for long periods of time recording their family gathering. Lamont testified that the Elliotts would go into the backyard of the 5310 Property within ten minutes of the Porters gathering in their own backyard.

Noemi testified that once, James sat in his truck watching the Porters with binoculars for at least six hours.

Patsy Stahl testified that she saw James lying by the side of his truck watching the Porters.

Based on the above testimony and evidence in the record, we find that substantial evidence supports finding of fact 36.

C.      PORTERS' NUISANCE CLAIM

The Elliotts argue that the trial court erred in finding that their conduct amounted to a nuisance against the Porters. We disagree.

1.   Legal Principles

"A nuisance is a substantial and unreasonable interference with the use and enjoyment of another person's property." *Kitsap County v. Kitsap Rifle and Revolver Club*, 184 Wn. App. 252, 276, 337 P.3d 328 (2014). The legislature codified the law of nuisance in chapter 7.48 RCW. *Id*. RCW 7.48.010 defines an actionable nuisance as "whatever is injurious to health . . .

or an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property." RCW 7.48.120 further defines nuisance as an "act or omission [that] either annoys, injures or endangers the comfort, repose, health or safety of others . . . or in any way renders other persons insecure in life, or in the use of property."

If a particular action interferes with the comfort and enjoyment of others, nuisance liability exists only when the action is unreasonable. *Kitsap Rifle*, 184 Wn. App. at 276. Whether a defendant's action is unreasonable requires balancing the harm of the aggrieved party against the social utility of the activity. *Id*. at 276-77. And whether certain conduct creates a nuisance generally is a question of fact. *Id*. at 277.

2. Analysis

The trial court made factual findings that the Elliotts (1) engaged in surveillance of the Porters' home; (2) engaged in purposeful noisemaking while the Porters were in their backyard, including banging a gong to annoy the Porters; (3) installed video surveillance cameras pointed at the Porters' property that could view into the Porters' residence in order to annoy and harass the Porters; (4) placed a handicap sign in the street and sitting next to it to prevent the Porters from parking on the street; (5) allowed and encouraged their dogs to bark at the Porters; (6) took photographs of license plates of vehicles belonging to contractors, guests, and members of the Porters' family; (7) used a drone to take photos and conduct surveillance of the Porters' property; and (8) provided false accounts of the Porters' activities to others. Based on these findings, the trial court concluded that the Elliotts' conduct constituted a nuisance.

Other than finding of fact 36, the Elliotts present no argument why substantial evidence does not support the trial court's findings regarding nuisance. Therefore, they are verities on appeal. *Real Carriage Door*, 17 Wn. App. 2d at 457. And we conclude above that substantial

16

evidence supports finding of fact 36. The issue is whether the Elliotts' behaviors were unreasonable based on a balancing of the harm toward the Porters and the social utility of the various activities. *Kitsap Rifle*, 184 Wn. App. at 276-77.

The Elliotts do not provide any argument that their activities have any social value. Instead, they make three arguments to support their claim that the trial court erred in finding a nuisance. First, the Elliotts argue that the Porters did not have a reasonable expectation of privacy regarding the interior of their house because they did not block their windows. The Elliotts suggest that if the windows are unblocked, looking into those windows cannot constitute a nuisance. But the Elliotts cite to no authority suggesting that a victim's reasonable expectation of privacy is an element of nuisance liability. The statutory definitions of nuisance do not contain such a requirement. In the absence of any authority, we decline to impose an expectation of privacy requirement for nuisance liability.

Second, the Elliotts argue that their conduct did not satisfy the definition of "surveillance" because it was not secretive. They rely on the definition of surveillance in RCW 9A.44.115(1)(d), the statute criminalizing voyeurism. But this is not a voyeurism case; it is a nuisance case. And the dictionary definition of "surveillance" is a "close watch kept on a person or persons." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2302 (2002). This definition does not require the close watch to be secretive.

Third, the Elliotts argue that their conduct at most created minor annoyances that did not cause substantial harm to the Porters and therefore cannot support nuisance liability. But the trial court's findings reflect more than "minor annoyances." And whether conduct constitutes a nuisance generally is a question of fact. *Kitsap Rifle*, 184 Wn. App. at 277. We defer to the trial court's evaluation of the evidence. *Young*, 9 Wn. App. 2d at 32.

We conclude that the trial court did not err in finding the Elliotts liable for nuisance.

D.    INJUNCTION ORDER

The Elliotts argue that the trial court erred by issuing the injunction because (1) it is not specific enough in violation of CR 65(d) and is unconstitutionally vague; (2) it infringes on their right to privacy under article I, section 7 of the Washington Constitution; and (3) the imposition of a $2,500 fine per violation of the injunction violates excessive fines provisions of the Eighth Amendment to the United States Constitution and article I, section 14 of the Washington Constitution.  We disagree.

1.    Legal Principles

Article IV, section 6 of the Washington Constitution gives trial courts authority to fashion equitable remedies.  *Guardado v. Taylor*, 17 Wn. App. 2d 676, 688, 490 P.3d 274 (2021).  Trial courts have "broad discretionary power" regarding equitable remedies.  *Id*. (quoting *Ehsani v. McCullough Family P'ship*, 160 Wn.2d 586, 589, 159 P.3d 407 (2007) (internal quotes omitted).  Such equitable remedies include injunctive relief.  *Kucera v. Dep't of Transp.*, 140 Wn.2d 200, 209, 995 P.2d 63 (2000).  "Trial courts have broad discretionary power to fashion injunctive relief to fit the particular circumstances of the case before it."  *Hoover v. Warner*, 189 Wn. App. 509, 528, 358 P.3d 1174 (2015).  Therefore, we generally review an injunction's terms for an abuse of discretion.  *Kitsap Rifle*, 184 Wn. App. at 297.

2.    CR 65(d) and Vagueness

CR 65(d) sets forth the form and scope of an injunction and provides that "[e]very order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained."  Because Federal Rule of Civil Procedure (FRCP) 65(d) is

18

identical to CR 65(d), we may look to cases interpreting the federal rule for guidance. *All Star Gas, Inc. of Wash. v. Bechard*, 100 Wn. App. 732, 736-37, 998 P.2d 367 (2000).

FRCP 65(d) " 'was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.' " *Fortyune v. Am. Multi–Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S. Ct. 713, 38 L. Ed. 2d 661 (1974)). As a result, FRCP 65(d) requires that the language of an injunction be reasonably clear so that an ordinary person will know precisely what action is prohibited. *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985). Injunctions do not violate the requirements of FRCP 65(d) " 'unless they are so vague that they have no reasonably specific meaning.' " *Fortyune*, 364 F.3d at 1087 (quoting *United States v. V–1 Oil Co.*, 63 F.3d 909, 913 (9th Cir.1995)).

The Elliotts seem to claim that an injunction must satisfy a constitutional vagueness standard apart from CR 65(d). However, the only cases they cite relate to penal laws, not to injunctions. In the absence of any authority, we analyze this injunction only under CR 65(d) and not under some unsupported constitutional theory.

The Elliotts argue that the injunction is unclear and vague in four ways. First, the injunction prohibits the Elliotts from engaging in certain behaviors while at or upon the Porters' 5306 Property "or at other locations where a violation of this Order may occur." CP at 1838. The Elliotts argue that it is unreasonable for the order to apply at locations other than the Porters' property because it could apply everywhere in the world, making it impossible for the Elliotts to know if they are violating the injunction at any given time.

But this provision is not vague. The order is very clear that the Elliotts cannot engage in the prohibited conduct not only at the Porters' property, but anywhere else. And this provision is reasonable in that it protects the Porters from being harassed on the road, in a store, or elsewhere in the community. And if the Elliotts inadvertently encounter the Porters in community, the Elliotts easily can avoid a violation of the injunction by refraining from photographing, staring at, or communicating with the Porters.

Second, the injunction states that it applies to the Elliotts or their "agents, associates, employees, attorneys, and upon those persons in active concert or participation with them who receive actual notice of this Injunction Order." CP at 1838. In other words, the Elliotts argue that the injunction restrains an unknown and unquantifiable number of persons. But the injunction clearly applies to the Elliotts and anyone closely associated with them who have actual notice of the injunction. That is a knowable and quantifiable number of persons. And it is not unreasonable to extend the injunction to people closely associated with the Elliotts.

Third, the injunction prohibits the Elliotts from engaging in certain actions "directed at" the Porters and people associated with them. CP at 1838. The Elliotts argue that it is unclear when an action will be deemed to have been directed at the Porters. However, only one specific injunction provision uses the term "directed at" – the provision stating that the Elliotts "shall not make excessive noise directed at [the Porters]." CP at 1838. The other provisions are clear as to what specific conduct is prohibited. And the excessive noise provision is clear when viewed in light of the trial courts finding of fact regarding this issue: "[The Elliotts] engaged in making *purposeful* noisemaking *while [the Porters] were in their backyard*." CP at 1817 (ff 38) (emphases added).

20

Fourth, the injunction prohibits the Elliotts from "focusing, glaring, [and] staring" at the Porters or their property. CP at 1838. The Elliotts argue that it is unclear what behaviors constitute focusing, glaring, or staring. But a person of common intelligence easily could distinguish between a "normal" look or glance, which would not be prohibited, and an act of prolonged staring, which would be prohibited.

We conclude that the injunction does not violate CR 65(d) and is not unconstitutionally vague.

3. Right to Privacy

The Elliotts argue that the injunction violates their right to privacy under the article I, section 7 of the Washington Constitution and due process and therefore is unduly oppressive. The Elliotts claim that the trial court does not have authority to prevent them from looking wherever they please while they are in the privacy in their own home. We disagree.

Article I, section 7 of the Washington Constitution states that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The Elliotts claim protection from this provision. But article I, section 7 applies equally to the Porters. They also have a right not to be disturbed in their private affairs.

The Elliotts essentially argue that they cannot be liable for nuisance for actions committed in their own home. But they cite no authority for this proposition. And the statutory definitions of nuisance do not provide such an exception to nuisance liability. In the absence of authority, we decline to hold that the Elliotts are free to engage in conduct that constitutes a nuisance as long as that conduct occurs in their home.

Accordingly, we reject the Elliotts' argument that the injunction violates their right to privacy.

21

4.    Excessive Fines Clause

The Elliotts argue that the trial court's imposition of a $2,500 fine per violation of the injunction is unconstitutional under the excessive fines clause of the Eighth Amendment and article I, section 14.  We disagree.

Both the Eighth Amendment and article I, section 14 prohibit excessive fines.  *State v. Grocery Mfrs. Ass'n*, 198 Wn.2d 888, 897-98, 502 P.3d 806 (2022).  "[A] fine is excessive 'if it is grossly disproportional to the gravity of the defendant's offense.' "  *Id.* at 899 (quoting *United States v. Bajakajian*, 524 U.S. 321, 334, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998)).  In addition, we also must consider a person's ability to pay the fine.  *Grocery Mfrs. Ass'n*, 198 Wn.2d at 899.  We review de novo whether a fine is excessive.

The Elliotts argue that the trial court imposed an automatic $2,500 fine for violation of the injunction, which is grossly disproportionate to any harm and does not account for their ability to pay.  They claim that if a violation occurs, the court should be free to fashion any appropriate remedy instead of a $2,500 fine.

But the Elliotts misread the injunction language.  The injunction states that a violation of its terms shall result in a sanction "in the sum of $2,500 *or such other sum as the Court deems proper*."  CP at 1839 (emphasis added).  Therefore, the trial court did *not* impose an automatic $2,500 fine for a violation of the injunction, as the Elliotts argue.  Rather, the trial court reserved to itself discretion to determine the amount of the sanction depending on each violation.  This determination can involve the seriousness of the violation and the Elliotts' ability to pay.  Therefore, we reject the Elliotts' excessive fines argument.

No. 57454-3-II

E.      IMPOSITION OF SANCTIONS

The Elliotts assign error to the trial court's order that the Elliotts pay the Porters $15,000 as sanctions for repeatedly and intentionally violating the mutual TRO. This order was based on finding of fact 44, which states that the Elliotts engaged in numerous activities prohibited by the mutual TRO after it was issued. However, the Elliotts fail to provide any argument for how the trial court's order of $15,000 in sanctions was made in error.

As noted above, we generally decline to consider an issue when the appellant has not provided meaningful argument. *Wiklem*, 551 P.3d at 1078 [¶ 54]. Therefore, we decline to address the Elliotts' argument that the trial court erred when it ordered the Elliotts to pay the Porters $15,000 in sanctions for violating the TRO.

F.      ATTORNEY FEES ON APPEAL

The Porters argue that this appeal is frivolous and that they should be awarded attorney fees pursuant to RAP 18.1. However, the Porters cite only to RAP 18.9(c), which allows this court to dismiss a frivolous appeal. Only RAP 18.9(a) allows the recovery of attorney fees for a frivolous appeal. *Hanna v. Margitan*, 193 Wn. App. 596, 614, 373 P.3d 300 (2016). Because the Porters do not request attorney fees under RAP 18.9(a), we decline to address the award of attorney fees on appeal. In any event, we conclude that the Elliotts' appeal is not frivolous.

CONCLUSION

We affirm the trial court's judgment.

23

No. 57454-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

We concur:

LEE, J.

PRICE, J.